IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BAY POINT CAPITAL PARTNERS II, LP,

Plaintiff,

v.

HOPLITE, INC., HOPLITE ENTERTAINMENT, INC., and JONATHAN LEE SMITH,

Defendants.

CIVIL ACTION NO.

## VERIFIED COMPLAINT

Plaintiff Bay Point Capital Partners II, LP (hereinafter, "Bay Point") hereby files this Verified Complaint against Defendants Hoplite, Inc. ("Hoplite"), Hoplite Entertainment, Inc. ("Hoplite Entertainment"), and Jonathan Lee Smith ("Smith;" Smith, Hoplite, and Hoplite Entertainment, collectively, the "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.     This action arises out of a $2 million loan Bay Point made to Hoplite and Hoplite Entertainment in September 2020 (the "Loan"), which was guaranteed by Smith, the President and Chief Executive Officer of both entities.  In order to

obtain the loan, Defendants knowingly presented falsified documents to Bay Point showing short-term accounts receivable in excess of $3.4 million, and Defendants offered Bay Point the receivables as security on the loan.  A short time later, after Defendants missed their very first installment payment just one month into the loan, Defendants created multiple phony electronic funds transfer notifications and presented them to Bay Point in an effort to forestall Bay Point from foreclosing on the Loan.  Bay Point endeavored to work with Defendants to secure repayment of the loan, including by agreeing to two separate forbearance agreements in December 2020 that provided Defendants additional time to cure their numerous defaults.  All along, however, Defendants never intended to repay their debt to Bay Point, and as of the date of the filing of this Complaint, Defendants have neither cured their defaults nor repaid their indebtedness to Bay Point.  Bay Point files this action seeking immediate repayment of all amounts owed under the applicable loan documents, among other relief.

## PARTIES, JURISDICTION, AND VENUE

2.     Plaintiff Bay Point is a Delaware limited partnership with its principal place of business in Atlanta, Georgia.

3.      Defendant Hoplite is a California corporation with its principal place of business in Los Angeles, California.  Hoplite is a privately-held corporation that is 100% owned and controlled by Defendant Smith.

4.      Defendant Hoplite Entertainment is a California corporation with its principal place of business in Los Angeles, California.  Hoplite Entertainment is a privately-held corporation, and Defendant Smith is Hoplite Entertainment's controlling shareholder.

5.      Defendant Smith is an individual residing in the State of California. In addition to serving as the sole and controlling shareholder of Hoplite and Hoplite Entertainment, respectively, Smith also serves as the President and Chief Executive Officer of both entities.

6.      Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1331 because this Court has original jurisdiction over Bay Point's claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq*.  This Court has jurisdiction over the remainder of Bay Point's claims pursuant to 28 U.S.C. § 1367(a) because all such claims are so related to the claims giving rise to this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Georgia.  Additionally, Defendants waived any argument that venue in this Court is not convenient.  (Ex. H, § 20; Ex. I, § 20; *see also* Ex. E, § 11.6(c); Ex. G, § 18(c).)

## FACTUAL BACKGROUND

*Initial Loan Discussions and Negotiation*

8.     Bay Point is a privately held investment fund specializing in short-term, secured lending to small- and medium-sized businesses that generally do not have access to traditional sources of capital.

9.     In furtherance of its lending practices, Bay Point frequently works with loan brokers who present various lending opportunities to Bay Point.  In late August 2020, Bay Point was approached by a broker named Walter Josten ("Josten").  Josten is the Founder and President of Blue Rider Pictures, a company specializing in short-term interim financing for the film industry.  At the time, Bay Point had an ongoing relationship with Josten, and Josten was aware Bay Point was seeking investment opportunities in the media and production industry.

10.     On August 24, 2020, two Bay Point employees, Chandler Rierson ("Rierson") and Rob Moran ("Moran"), spoke with Josten by telephone.  Josten

- 4 -

was joined in the conversation by Max Musina ("Musina"), Josten's outside business partner.

11.     During that conversation, Josten and Musina informed Bay Point that they were aware of a California-based media company seeking short-term financing. Specifically, Josten and Musina told Bay Point that the putative borrowers were two related, closely-held entities, Hoplite and Hoplite Entertainment, which were both under Smith's direct control and management. Musina also indicated that he had known Smith for a long time.

12.     Josten and Musina further represented to Bay Point that Hoplite, Hoplite Entertainment, and Smith had significant accounts receivable against which they were willing to borrow funds, and that they were seeking funding to sustain their operations until their receivables were realized. In the lending industry, this type of transaction is referred to as a "bridge loan."

13.     On August 25, 2020, Josten sent a follow-up email to Rierson and Moran. In his email, Josten recounted the substance of the prior day's telephone call and memorialized the terms of the proposed financing deal. A true and correct copy of the email from Josten to Rierson and Moran is attached hereto as Exhibit A.

14.     Relevant to this Complaint, Josten reiterated that Hoplite and Hoplite Entertainment were seeking immediate funding in an amount between $1 million and $2 million, and that they were willing to borrow against their then-existing short-term accounts receivable of $3,438,000.  Specifically, Josten represented that Hoplite and Hoplite Entertainment's then-existing receivables consisted of a $1,488,000 receivable from "Screen media / Crackle / Sony," a $1,000,000 receivable from "Fight Channel," and a $950,000 receivable from "Big Media / National Geographic."

15.     However, before agreeing to engage in discussions directly with Smith on behalf of Hoplite and Hoplite Entertainment, Bay Point indicated that it first needed to see documentation supporting the existence of, and amounts due and owing under, the borrowers' claimed accounts receivable.

16.     On August 27, 2020, Hoplite, Hoplite Entertainment, and Smith, through Josten, provided Bay Point with what they represented to be documentary proof of their then-existing short-term receivables.  Included among the documents were: (1) a License Agreement between Hoplite Entertainment and Big Media Holdings LLC evidencing a purported receivable of $950,000; (2) a License Agreement between Hoplite Entertainment and Screen Media Ventures, LLC evidencing a purported receivable of $1,488,000; and (3) an Acquisition

Agreement between Hoplite and Ineomeida, Inc., d/b/a Fight Channel World Network evidencing a purported receivable of $1,000,000. True and correct copies of the as-received documents are attached hereto as Exhibits B, C, and D, respectively.

17.     Based on the purported value of the accounts receivable evidenced by the agreements Hoplite, Hoplite Entertainment, and Smith provided to Bay Point through Josten, Bay Point elected to move forward with the lending process.

18.     Thereafter, the parties negotiated the terms of the Loan through Musina, who served as an intermediary. Throughout the negotiations, Smith communicated with Bay Point through Musina.

19.     On September 3, 2020, Bay Point, Hoplite, Hoplite Entertainment, and Smith executed a Term Sheet, which memorialized the preliminary Loan terms.

20.     On September 24, 2020, Musina arranged for Rierson and Moran to meet Smith in person at the Hotel Casa del Mar in Santa Monica, California. Musina also attended the meeting. At the September 24, 2020 meeting, the parties finalized the preliminary terms of the Loan and agreed to move forward with execution of the Loan documents.

*Execution of Loan Documents*

21.     In late September 2020, Bay Point entered into the Loan and Security Agreement dated September 30, 2020 (the "Loan Agreement") with Hoplite and Hoplite Entertainment, jointly and severally, pursuant to which Bay Point agreed to make a loan in the principal amount of $2 million with interest accruing each month.  The Loan Agreement bore a maturity date of December 30, 2020.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit E.

22.     The Loan was evidenced by a promissory note, also in the amount of $2 million, dated September 30, 2020 (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit F.

23.     Defendant Smith guaranteed Hoplite and Hoplite Entertainment's payment and performance obligations owed to Bay Point pursuant to the Loan Agreement and Note, as set forth in the Guaranty Agreement executed on September 30, 2020 (the "Guaranty Agreement").  A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit G.

24.     The Loan Agreement, Note, and Guaranty Agreement are hereinafter referred to as, collectively, the "Loan Documents."

25.     In the interest of convenience, Defendant Smith executed the Loan Documents, both in his individual capacity as guarantor and his representative

capacity as President and Chief Executive Officer of Hoplite and Hoplite Entertainment, at Bay Point's counsel's office in Los Angeles, California. At all relevant times hereto, Defendant Smith was aware that the original copies of the Loan Documents would be mailed from Los Angeles, California to Bay Point's principal place of business in Atlanta, Georgia, and that such mailing was a necessary prerequisite to formalizing the parties' financing agreement.

26.     On or around September 28, 2020, original copies of the signed Loan Documents were sent via FedEx overnight mail from Bay Point's counsel's office in Los Angeles, California to Bay Point's counsel's office in Richmond, Virginia for processing. Shortly thereafter, on or around October 12, 2020, original copies of the signed Loan Documents were sent via FedEx overnight mail from Bay Point's counsel's office in Richmond, Virginia to Bay Point's principal place of business in Atlanta, Georgia.

27.     On October 7, 2020, after execution of the Loan Documents was complete, Smith organized a meeting between himself, Bay Point, and an individual named Pedro Ferre ("Ferre"), who was the Managing Director of the Turpera Group. Smith arranged for Ferre to fly from Los Angeles, California to Atlanta, Georgia to attend the meeting. At the meeting, Ferre indicated that he had

the authority to represent Smith in Smith's business dealings with Bay Point, including with specific regard to the loan.

28.    A second face-to-face meeting between Bay Point, Ferre, and Smith occurred on November 13, 2020 in Atlanta, Georgia.

*Relevant Provisions of Loan Documents*

29.    Section 2.3(a) of the Loan Agreement provides that Hoplite and Hoplite Entertainment "shall pay [Bay Point] monthly installments of accrued and unpaid interest" commencing on October 31, 2020.  Section 2.3(a) further provides that "[t]he outstanding principal balance of the Loan and all unpaid interest shall be paid in full on the Maturity Date."  As noted above, the Loan Agreement bore a maturity date of December 30, 2020.

30.    Section 2.8(c) of the Loan Agreement provides that failure to make any payment due under the Loan within five (5) days after the due date thereof will result in a late fee equal to ten percent (10%) of the amount of such late payment.

31.    Additionally, Section 2.4(b) of the Loan Agreement provides that, during the pendency of any Event of Default, all outstanding obligations will accrue interest at a rate of five percent (5%) per annum in addition to the otherwise applicable interest rate.

32.     Section 2.14(a) of the Loan Agreement provides that Hoplite and Hoplite Entertainment are "jointly and severally liable to [Bay Point] for the payment or performance of all Obligations."

33.     The Loan Agreement provides that the receivables evidenced by the License Agreement between Hoplite Entertainment and Big Media Holdings LLC, the License Agreement between Hoplite Entertainment and Screen Media Ventures, LLC, and the Acquisition Agreement between Hoplite and Ineomeida, Inc., d/b/a Fight Channel World Network would serve as "Specified Collateral" on the Loan. (*See id*., § 1.1 at 7.)

34.     Section 2.11 of the Loan Agreement provides for the creation and maintenance of a Specified Collateral Proceeds Account to hold any funds generated by the receivables associated with the Specified Collateral accounts. Bay Point was provided "sole access and control of" the Specified Collateral Proceeds Account.  Pursuant to Section 2.11(b), any payments Hoplite and Hoplite Entertainment received from the Specified Collateral sources were to be forwarded directly into the Specified Collateral Proceeds Account, and any such funds were to be held in the Specified Collateral Proceeds Account as additional security for Bay Point.  Additionally, at maturity, the funds in the Specified Collateral Proceeds

Account were to be credited to Hoplite and Hoplite Entertainment's outstanding indebtedness to Bay Point.

35.    The Loan Agreement also provides Bay Point with a lien and security interest in the form of a valid, first priority security interest in certain of Hoplite and Hoplite Entertainment's presently existing and later acquired Collateral. Specifically, § 4.1 of the Loan Agreement states:

> To secure prompt payment of any and all Obligations and prompt performance by each Borrower of each of its covenants and duties under the Loan Documents, each Borrower hereby grants Lender a continuing Lien on and security interest in all of such Borrower's right, title and interest in and to all of the following presently existing and hereafter acquired or arising property, wherever located (collectively, the "Collateral"): all Accounts; chattel paper (including tangible and electronic chattel paper); commercial tort claims; deposit accounts; securities accounts; documents (including negotiable documents); equipment (including all accessions and additions thereto); general intangibles (including payment intangibles and software), including, without limitation, the Specified Collateral; Intellectual Property; goods (including fixtures); instruments (including promissory notes); inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions); investment property (including securities and securities entitlements); letter of credit rights; money; all books and records with respect to any of the foregoing and the computers and equipment containing any such books and records; any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

36.     Section 8 of the Loan Agreement defines the events that constitute an "Event of Default."   Under Section 8.1, any instance of Hoplite and Hoplite Entertainment's failure to pay, when due, any principal, interest, or other amounts due and payable under the Loan Agreement constitutes an independent Event of Default.  Likewise, if Hoplite and Hoplite Entertainment violate any provision of Section 6 or Section 7 of the Loan, they have committed an Event of Default.  (*See id.*, § 8.2.)  Finally, if Hoplite and Hoplite Entertainment make "any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to [Bay Point] or to induce [Bay Point] to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is false or misleading in any material respect when made," then they have committed an Event of Default.  (*See id.*, § 8.8.)  In the event of any Event of Default, Section 9 of the Loan Agreement provides Bay Point with several non-exclusive rights and remedies.

37.     Under Section 9.1(a), Bay Point may declare all of Hoplite and Hoplite Entertainment's obligations immediately due and payable.  Section 9.1(b) permits Bay Point to exercise any rights and remedies available under the Loan Documents or at law or equity.  Pursuant to Section 9.1(d), Bay Point may "do such acts as [Bay Point] considers necessary or reasonable to protect its security

interest in the Collateral," including taking and maintaining possession of the Collateral, selling the Collateral, or disposing of the Collateral by way of one or more contracts or transactions.

38.     Under the Guaranty Agreement, Smith "unconditionally and irrevocably guarantee[d] to [Bay Point] the principal payment and performance of all of the obligations" owed by Hoplite and Hoplite Entertainment to Bay Point pursuant to the Loan Agreement.  (*See* Ex. G, § 1.)

39.     Smith's Guaranty Agreement includes, without limitation, the unconditional and irrevocable obligation to pay "all loans, financial accommodations, and other sums now owing or which may in the future be owing by [Hoplite and Hoplite Entertainment] under the Loan Agreement and the other Loan Documents, as and when the same are due and payable, whether on demand, at stated maturity, by acceleration or otherwise, and whether for principal, interest, fees, expenses, indemnification or otherwise."  (*See id.*).

40.     Pursuant to Sections 2 and 3 of the Guaranty Agreement, Smith's obligations are "absolute and unconditional" and "shall remain in full force and effect until payment in full of all Guaranteed Obligations and other amounts payable under this Guaranty and until the Loan Documents are no longer in effect."

41.     Section 10 of the Guaranty Agreement provides that in the event of an Event of Default under the Loan Agreement, Bay Point is permitted "in addition to exercising any remedies set forth in this Guaranty or otherwise available at law or in equity, to accelerate Guarantor's obligations hereunder."

42.     Finally, the Note provides: "If an Event of Default shall occur and be continuing, the entire unpaid Principal Sum and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Loan Agreement."  (*See* Ex. F, at 1.)

43.     The Loan Agreement, Note, and Guaranty Agreement provide that Defendants will reimburse Bay Point for all costs and expenses incurred in enforcing Defendants' obligations under the Loan Documents, including Bay Point's reasonable attorneys' fees.  (*See* Ex. E, § 11.4; Ex. F, at 2; Ex. G, § 14.)

*Initial Events of Default*

44.     Pursuant to Section 2.3(a) of the Loan Agreement, Hoplite and Hoplite Entertainment's first monthly installment payment of accrued and unpaid interest was due and payable on October 31, 2020.

45.     Hoplite and Hoplite Entertainment failed to pay the accrued and unpaid interest on October 31, 2020.  This constituted an "Event of Default" under Section 8.1 of the Loan Agreement.

46.    Pursuant to Section 2.3(a) of the Loan Agreement, Hoplite and Hoplite Entertainment's second monthly installment payment of accrued and unpaid interest was due and payable on November 30, 2020.

47.    Hoplite and Hoplite Entertainment failed to pay the accrued and unpaid interest on November 30, 2020.  This constituted an additional "Event of Default" under Section 8.1 of the Loan Agreement.

*Forbearance Agreements & Additional Defaults*

48.    As a result of the Events of Default, Bay Point was entitled to pursue any and all of the rights and remedies provided under Section 9 of the Loan Agreement, including the right to accelerate the entire outstanding indebtedness and the right to pursue any remedy available at law or equity against Hoplite, Hoplite Entertainment, and Smith.

49.    However, in or around early December 2020, Defendants requested Bay Point forbear from exercising its undisputed rights and remedies under Section 9 of the Loan Agreement, and the parties entered into preliminary negotiations to that effect.

50.    Ultimately, the parties reached a settlement that was memorialized in a Forbearance Agreement dated December 4, 2020 (the "First Forbearance Agreement"), which was entered into by Bay Point, on the one hand, and Hoplite,

Hoplite Entertainment, and Smith, on the other.  A true and correct copy of the First Forbearance Agreement is attached hereto as Exhibit H.

51.     At the time the parties entered into the First Forbearance Agreement, Defendants' total outstanding indebtedness to Bay Point was $2,235,238.89, as evidenced by Recital H to the First Forbearance Agreement.  (*See* Ex. H, at 2.)

52.     Section 20 of the First Forbearance Agreement provides that "this Agreement and the Loan Documents shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of Nevada[.]"  The First Forbearance Agreement further provides that the parties consent to the personal jurisdiction of Georgia's federal and state courts and that the parties waive any challenge to the convenience of such venues.  (*See id*.)

53.     The First Forbearance Agreement further provides that, "[t]o the extent terms or provisions in this Agreement and the Loan Documents conflict or are inconsistent, the terms of this Agreement shall control."  (*See id*., § 1(d).)

54.     Pursuant to Section 2 of the First Forbearance Agreement, Bay Point agreed to forbear exercising its rights and remedies for Defendants' breaches of the Loan Documents until 4:00 p.m. on December 11, 2020.  In exchange for Bay Point's forbearance, Defendants agreed to make three payments on or before December 11, 2020: (1) a payment of $200,000 to satisfy past due interest on the

Loan Documents; (2) a payment of $2,013,850; and (3) a payment in satisfaction of all remaining outstanding indebtedness accrued by Defendants as of such date. (*See id.*, §§ 2(e)–(g).)

55. Section 4 of the First Forbearance Agreement provided that any failure to make the payments identified in Section 2(e)–(g) on or before 4:00 p.m. on December 11, 2020 would constitute an immediate Event of Default.

56. Defendants failed to make any of the payments set forth in Section 2 of the Agreement by 4:00 p.m. on December 11, 2020. This constituted an "Event of Default" under the First Forbearance Agreement.

57. Accordingly, Bay Point's forbearance obligations were extinguished, and Bay Point was entitled to pursue any and all of the rights and remedies provided under Section 9 of the Loan Agreement, including the right to accelerate the outstanding indebtedness and to pursue any remedy available at law or equity against Hoplite, Hoplite Entertainment, and Smith.

58. However, on December 18, 2020, Ferre sent an email to Charles Andros, Bay Point's President and Chief Investment Officer, purporting to be acting on Defendant Smith's behalf. Ferre indicated that he "was able to get [Smith] to agree to" a modified payment schedule, which Ferre stated that he believed provided "a workable and realistic solution for [Smith] to close out his

debt to [Bay Point]."  In conjunction with the modified payment terms set forth in his email, Ferre stated: "I am asking on his behalf for a few extra weeks."

59.   Ultimately, based on the representations made in Ferre's December 18, 2020 email on Smith's behalf, the parties reached an agreement for Bay Point to forbear that was memorialized in a Forbearance Agreement dated December 21, 2020 (the "Second Forbearance Agreement").  A true and correct copy of the Second Forbearance Agreement is attached hereto as Exhibit I.

60.   On December 22, 2020, Defendants sent the original copy of the Second Forbearance Agreement via FedEx overnight mail from Hollywood, California to Bay Point's principal place of business in Atlanta, Georgia.

61.   At the time the parties entered into the Second Forbearance Agreement, Defendants' total outstanding indebtedness to Bay Point was $2,517,618.89, as provided in Recital I of the Second Forbearance Agreement. (*See* Ex. I, at 2.)

62.   Section 20 of the Second Forbearance Agreement provides that "this agreement and the loan documents shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of Nevada[.]" (capitalization omitted).  The Second Forbearance Agreement further provides that the parties

consent to the personal jurisdiction of Georgia's federal and state courts and that the parties waive any challenge to the convenience of the venue.  (*See id*.)

63.    The Second Forbearance Agreement also provides that "[t]o the extent terms or provisions in this Agreement and the Loan Documents conflict or are inconsistent, the terms of this Agreement shall control."  (*See id*., § 1(d).)

64.    Pursuant to Section 3 of the Second Forbearance Agreement, Bay Point agreed to forbear exercising its rights and remedies for Defendants' breaches of the Loan Documents until 4:00 p.m. on January 15, 2021, provided that no Event of Default occurred before such date.  In exchange for Bay Point's forbearance, Defendants agreed to make three payments: (1) a payment of $200,000 on or before December 23, 2020, to satisfy past due interest on the Loan Documents; (2) a payment of $1,000,000 on or before December 31, 2020; and (3) a payment of $1,100,000 on or before January 15, 2021.  If Defendants made all three payments, then Bay Point agreed to waive all remaining indebtedness on the Loan Documents.  (*See id*., § 4.)

65.    Section 5 of the Second Forbearance Agreement provided that any failure to make the payments identified in Section 3 on or before the date identified therein would constitute an immediate Event of Default, entitling Bay Point to

again pursue all available remedies under the Loan Agreement and at law or equity.

66.    Defendants failed to make the payments set forth in Sections 3(a)–(b) of the Second Forbearance Agreement by the dates set forth therein.  These failures to meet the payment deadlines constituted additional "Events of Default" under the Second Forbearance Agreement.  Additionally, pursuant to Section 6 of the Second Forbearance Agreement, Defendants' failure to make timely payments resulted in the immediate acceleration of the entire outstanding indebtedness.

67.    Accordingly, Bay Point's forbearance obligations were again extinguished, and Bay Point was entitled to pursue any and all of the rights and remedies provided under Section 9 of the Loan, including the right to pursue any remedy available at law or equity against Hoplite, Hoplite Entertainment, and Smith.

68.    To date, Defendants have not repaid any of their outstanding indebtedness to Bay Point, including the principal, interest, late fees, attorneys' fees, and other related costs and expenses.

*Defendants' Fraudulent Scheme Comes to Light*

69.    Defendants induced Bay Point into loaning them $2 million by representing to Bay Point that they had at least $3,438,000 in then-existing short-

term accounts receivable from their prior agreements with three outside parties.  In support thereof, Defendants provided Bay Point with what Defendants represented to be true and accurate copies of these agreements.  (*See* Exs. B, C, & D.)

### *(1) Falsified ACH and Wire Transfer Confirmations*

70.    In furtherance of their scheme to induce Bay Point to lend them $2 million, Defendants agreed to assign the rights to payment of these outstanding accounts receivable to Bay Point as "Specified Collateral" on the Loan.  Thus, in accordance with Section 2.11 of the Loan Agreement, any payments made to Hoplite or Hoplite Entertainment under the third-party agreements specified above were to be made either (1) directly to Bay Point by the third-party debtors, or (2) to Hoplite and Hoplite Entertainment, who were then obligated to remit the funds to Bay Point.  In either instance, all such funds were to be held in the Specified Collateral Proceeds Account and, subject to several enumerated exceptions, would ultimately be used to satisfy Hoplite and Hoplite Entertainment's indebtedness to Bay Point.

71.    On November 17, 2020, at 10:19 a.m., Defendant Smith sent an email to Rierson and Moran, who, as noted above, are the Bay Point employees primarily responsible for the relationship with Defendants.  A true and correct copy of the email correspondence is attached hereto as Exhibit J.

72.    Smith's email represented that he was forwarding an earlier message from Seth Needle, an executive of Screen Media Ventures, to Smith, which showed what appeared to be the confirmation of a Wells Fargo automated clearing house (ACH) transfer, which is a type of electronic funds transfer.  The amount of the alleged ACH transfer was $1,488,000, which constituted the full amount owed to Hoplite Entertainment under its prior agreement with Screen Media Ventures, and to which Bay Point had a priority claim pursuant to Section 2.11 of the Loan Agreement.  Thus, Smith represented that Hoplite Entertainment had been paid in full by Screen Media Ventures and that, in turn, Bay Point would be repaid with the same funds in due course.

73.    At the time Smith sent the November 17, 2020 email to Bay Point, Defendants were already in default on the Loan Documents after failing to make the October 31, 2020 installment payment.

74.    Additionally, in the nearly two months since the Loan Documents had been signed, no funds had been deposited in the Specified Collateral Proceeds Account either directly from the third-party debtors or indirectly through Hoplite and Hoplite Entertainment.

75.    Thus, Bay Point was initially relieved to receive Smith's email, which made it appear as though $1,488,000 would be deposited into the Specified Collateral Proceeds Account, either directly or indirectly, within a matter of days.

76.    Bay Point never received the funds shown in the purported ACH transfer.

77.    Two weeks later, on December 1, 2020, Chandler Rierson of Bay Point forwarded Smith's November 17, 2020 email correspondence directly to Seth Needle at Screen Media Ventures and asked Mr. Needle to call him to discuss Screen Media Ventures' purported ACH transfer to Hoplite on November 17, 2020.  (*See* Ex. J.)

78.    Later that same day, Seth Needle responded to Bay Point via email, writing: "Unfortunately, it appears this is a scam, as I did not ever send any such email."  (*See id.*)

79.    Upon information and belief, Defendants fabricated the Wells Fargo ACH transfer confirmation, including by making it appear as though Screen Media Ventures had electronically transferred the precise amount of its purported indebtedness to Hoplite Entertainment, and then sent a copy of the fraudulent ACH transfer notification to Bay Point via email in order to convince Bay Point not to foreclose on the Loan Documents, which were then in default.

80.    In the interim, Smith forwarded another funds transfer confirmation to Chandler Rierson and Rob Moran at Bay Point on November 20, 2020, which showed that a wire transfer had been initiated and was being processed.  A true and correct copy of the November 20, 2020 email correspondence is attached hereto as Exhibit K.

81.    The wire transfer initiation notification indicated that Defendants were in the process of wiring $100,000 directly to Bay Point's bank account, and that the funds would be deposited on November 23, 2020.

82.    Again, however, Bay Point never received the funds reflected in the purported wire transfer notification.

83.    Upon information and belief, Defendants also fabricated this second Wells Fargo wire transfer confirmation in an effort to further convince Bay Point not to exercise its remedies under the Loan Documents, which remained in default.

*(2) Falsified License Agreement*

84.    After Bay Point learned that the purported ACH funds transfer from Screen Media Ventures was fraudulent, Bay Point asked Seth Needle to send Bay Point a copy of Screen Media Ventures' License Agreement with Hoplite Entertainment.

85.    On December 2, 2020, Seth Needle responded to Bay Point via email. Attached to Mr. Needle's email correspondence was a copy of Screen Media Ventures' License Agreement with Hoplite Entertainment.  A true and correct copy of the License Agreement provided by Mr. Needle is attached hereto as Exhibit L.

86.    The License Agreement provided by Screen Media Ventures was nearly identical to the one previously provided to Bay Point by Defendants during the initial Loan negotiations, with two glaring exceptions: There was no Section 2(c) requiring advance payments (pg. 1), and in Exhibit A of the License Agreement (pg. 4), there was no mention of the $1,488,000 monetary advance. These terms, however, appeared in the copy of the License Agreement that Defendants provided to Bay Point during their prior Loan negotiations as proof of a then-existing short-term receivable.  (*Compare* Ex. C, at 1 & 4, *with* Ex. L, at 1 & 4.)

87.    Upon information and belief, Defendants fraudulently added material terms to the version of the License Agreement with Screen Media Ventures provided to Bay Point in order to make it appear as if Screen Media Ventures had agreed to advance Hoplite Entertainment the sum of $1,488,000, when Screen Media Ventures had not.  Upon further information and belief, Defendants forged

the signatures on behalf of Screen Media Ventures in the version of the License Agreement with Screen Media Ventures provided to Bay Point.

88.    Defendants then used that falsified License Agreement to induce Bay Point to lend them the sum of $2 million, and gave Bay Point "security" in the form of a priority right to a receivable that did not exist.

*Hoplite Entertainment's Incorporation is Suspended*

89.    On or about October 1, 2020, Hoplite Entertainment's incorporation with the California Secretary of State was changed from "Active" to "FTB Suspended."   This status change indicates that "[t]he business entity was suspended . . . by the Franchise Tax Board for failure to meet tax requirements (e.g., failure to file a return, pay taxes, penalties, interest)."   As a result of its failure to meet certain of its tax obligations, Hoplite Entertainment's powers, rights and privileges, which include the right to use the entity's name in California, were suspended.

90.    As of January 22, 2021, Hoplite Entertainment's incorporation remains suspended.

*Continuing Default and Amounts Owed*

91.    As of the date of the filing of this Verified Complaint, Defendants Hoplite, Hoplite Entertainment, and Smith remain in default on the Loan

Documents, as well as the First and Second Forbearance Agreements. Additionally, upon committing an Event of Default under the Second Forbearance Agreement, the entire outstanding indebtedness was automatically accelerated and became immediately due and payable.

92.     As of January 22, 2021, the total amount owed under the Loan Documents, inclusive of the First and Second Forbearance Agreements, is $2,688,611.11 (the "Indebtedness"), which is comprised of:

(a)     $2,000,000 in principal and $376,666.67 in interest thereon, which continues to accrue at the fixed rate of five (5) percent per month;

(b)     $56,944.44 in default interest, which accrued at a rate of five (5) percent per annum from November 4, 2020 to December 11, 2020, and which continues to accrue at a rate of twenty (20) percent from December 12, 2020 to present, in addition to the otherwise applicable interest rate on the principal balance of the Loan Documents;

(c)     $230,000.00 in Late Fees; and

(d)     $25,000.00 in Legal Fees.

*Miscellaneous Security Interests*

93.     Hoplite and Hoplite Entertainment are jointly indebted to Columbia State Bank under the terms of a Business Loan Agreement dated April 21, 2020

(the "SBA Loan").  The SBA Loan is in the principal amount of $750,000 and bears a maturity date of April 21, 2021.  As security for the SBA Loan, Hoplite and Hoplite Entertainment pledged their interests in two television programs ("Ink Therapy III" and "We Bought a Vineyard") to Columbia State Bank.

94.   On September 28, 2020, Columbia State Bank provided written consent to the execution of the Loan from Bay Point to Hoplite and Hoplite Entertainment, and executed a Standby Creditor's Agreement (the "Standby Agreement") in Bay Point's favor whereby Columbia State Bank agreed to subordinate its SBA Loan to Bay Point's Loan.  As part of the Standby Agreement, Columbia State Bank retained its priority security interests in Ink Therapy III and We Bought a Vineyard.

95.   True and correct copies of the consent letter, Standby Agreement, and the SBA Loan are attached hereto as Exhibit M.

96.   During the Loan negotiation process, several additional of Hoplite and/or Hoplite Entertainment's creditors executed debt subordination or standby agreements in Bay Point's favor, whereby the creditors agreed to subordinate their loans to Bay Point's Loan.

97.   On October 1, 2020, Bay Point filed California Uniform Commercial Code Financing Statements (UCC 1) with the California Secretary of State to

perfect its security interests in Hoplite and Hoplite Entertainment's Collateral. True and correct copies of the Lien Search Certificates evidencing the perfection of Bay Point's security interests are attached hereto as Exhibit N.

## COUNT ONE
### Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(c)
### (All Defendants)

98.   The allegations of Paragraphs 1 through 97 above are incorporated by reference as if fully set forth herein.

99.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is, and at all relevant times hereto was, an individual or entity capable of holding a legal or beneficial interest in property.

100.  As detailed above and herein, Defendants collectively formed an "enterprise" within the meaning of 18 U.S.C. § 1961(4) in that they are a group of individuals and corporations associated in fact, although not a single legal entity. At all relevant times hereto, Defendants' enterprise was engaged in interstate commerce to facilitate, manage, establish, and carry on their enterprise's fraudulent scheme.

101.  Defendants formed a common scheme and enterprise for the common purpose of fraudulently inducing Bay Point to convey $2 million to Defendants, when Defendants had no intention of repayment of such funds.

102.   Each of the Defendants conducted and participated in the operations of the enterprise through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1962(c) and 1961(5), including by engaging in acts indictable as wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341.

103.   In furtherance of their enterprise, Defendants transmitted fraudulent documents and representations to Bay Point through the means of wire communication in violation of 18 U.S.C. § 1343.  Specifically, and as detailed at length above, on August 27, 2020, Defendants caused the enterprise to send to Bay Point by electronic mail a fraudulent License Agreement purporting to evidence $1,488,000 in accounts receivable for the sole purpose of inducing Bay Point to make a Loan to Defendants in the amount of $2 million.  Additionally, on November 17, 2020, and November 20, 2020, Defendants caused the enterprise to send to Bay Point by electronic mail two fraudulent electronic payment confirmations evidencing electronic funds transfers that, in reality, were never sent. Defendants did so for the sole purpose of furthering their scheme to avoid repayment of Bay Point's $2 million Loan to Defendants.

104.   In furtherance of their scheme, Defendants also sent documents through the United States Postal Service and/or private or commercial interstate carriers in violation of 18 U.S.C. § 1341.  Specifically, on or about September 28,

2020, Defendant Smith signed the Loan Agreement, Note, and Guaranty Agreement with the understanding that the original copies of such documents would be transmitted from California to Bay Point's principal place of business in Atlanta, Georgia by the United States Postal Service or a private or commercial interstate carrier and that such cross-country transmission of the original documents was a necessary prerequisite to formalizing the lending agreement. And, consistent with Defendants' understanding, the original copies of the Loan Documents were sent via FedEx overnight mail to Bay Point's counsel's office in Richmond, Virginia for processing on or around September 28, 2020, and were then sent via FedEx overnight mail from Bay Point's counsel's office in Richmond, Virginia to Bay Point's principal place of business in Atlanta, Georgia on or around October 12, 2020.  Additionally, on December 22, 2020, Defendants sent the original copy of the Second Forbearance Agreement via FedEx overnight mail from Hollywood, California to Bay Point's principal place of business in Atlanta, Georgia.

105.  Defendants' fraudulent acts, including Defendants' multiple commissions of wire fraud and mail fraud, formed a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  Such acts were interrelated by virtue of common participants, a common victim, a common method of

commission and course of conduct, and the common purpose and common result of defrauding Bay Point of $2 million and enriching the Defendants at Bay Point's expense while concealing their fraudulent activities.

106.   As a direct and proximate result of the racketeering activity engaged in by Defendants' fraudulent enterprise, Bay Point suffered injury to its business or property within the meaning of 18 U.S.C. § 1964(c).

107.   Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to Bay Point for three times the damages sustained, as well as Bay Point's litigation costs and reasonable attorneys' fees.

## <u>COUNT TWO</u>
### Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(d) – Conspiracy
### (All Defendants)

108.   The allegations of Paragraphs 1 through 107 above are incorporated by reference as if fully set forth herein.

109.   Section 1962(d) prohibits any person from conspiring with other persons to violate 18 U.S.C. § 1962(c).

110.   As detailed above and herein, Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to engage in a common scheme and enterprise for the common purpose of obtaining funds from Bay Point through a pattern of

racketeering activity, including but not limited to the transmission of fraudulent documents and other communications to Bay Point by wire and mail.

111.   Defendants knew their common scheme and enterprise was part of a pattern of racketeering activity and agreed to the commission of those acts to accomplish the goals of their fraudulent enterprise.

112.   Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

113.   As a direct and proximate result of Defendants' conspiracy, and the overt acts taken in furtherance of that conspiracy, Bay Point suffered injury to its business or property as set forth above.

114.   Because of Defendants' violations of 18 U.S.C. § 1962(d), Defendants are liable to Bay Point for three times the damages sustained, as well as Bay Point's litigation costs and reasonable attorneys' fees.

## <u>COUNT THREE</u>
### Breach of Contract – Loan Agreement and Note
### (Defendants Hoplite and Hoplite Entertainment)

115.   The allegations of Paragraphs 1 through 114 above are incorporated by reference as if fully set forth herein.

116.   Defendants Hoplite and Hoplite Entertainment executed the Loan Agreement and Note attached hereto as Exhibits E and F, respectively.

117.   Bay Point has performed all of its obligations and conditions precedent under the Loan Agreement and Note.

118.   Defendants Hoplite and Hoplite Entertainment breached the Loan Agreement and Note by failing to perform certain covenants thereunder, including by (1) failing to pay the interest payments due on October 31, 2020, and November 30, 2020, (2) failing to pay the entire indebtedness immediately upon the occurrence of several Events of Default, and (3) failing to pay the entire indebtedness on the Maturity Date.

119.   As a direct and proximate result of Defendants Hoplite and Hoplite Entertainment's breaches of the Loan Agreement and Note, Bay Point has sustained damages in an amount to be determined at trial.

120.   Pursuant to the Loan Agreement, Defendants Hoplite and Hoplite Entertainment are jointly and severally liable for any such damages awarded to Bay Point.

## COUNT FOUR
### Breach of Contract—Guaranty Agreement
### (Defendant Smith)

121.   The allegations of Paragraphs 1 through 120 above are incorporated by reference as if fully set forth herein.

122.   Defendant Smith executed the Guaranty Agreement attached hereto as Exhibit G.

123.   Pursuant to the Guaranty Agreement, Smith is unconditionally and irrevocably obligated to pay all obligations of Hoplite and Hoplite Entertainment under the Loan Agreement and other Loan Documents, including the payment of all principal, interest, fees, and expenses whenever any such obligations become due and payable.

124.   Smith breached the Guaranty Agreement by failing to pay Hoplite and Hoplite Entertainment's entire indebtedness upon the occurrence of any of the Events of Default.

125.   Smith further breached the Guaranty Agreement by failing to pay the entire outstanding balance of the Loan Documents on the Maturity Date, or at any time thereafter.

126.   As a direct and proximate result of Smith's breaches of the Guaranty Agreement, Bay Point has sustained damages in an amount to be determined at trial.

## COUNT FIVE
### Breach of Contract – First Forbearance Agreement
### (All Defendants)

127.   The allegations of Paragraphs 1 through 126 above are incorporated by reference as if fully set forth herein.

128.   Defendants Hoplite, Hoplite Entertainment, and Smith executed the First Forbearance Agreement attached hereto as Exhibit H.

129.   Bay Point has performed all its obligations and conditions precedent under the First Forbearance Agreement.

130.   Defendants breached the First Forbearance Agreement by failing to perform certain covenants thereunder, including by (1) failing to pay the sum of $200,000 on or before December 11, 2020, (2) failing to pay the sum of $2,013,850 on or before December 11, 2020, and (3) failing to pay the entire outstanding indebtedness by 4:00 p.m. on December 11, 2020, as provided by Section 2(g) of the First Forbearance Agreement.

131.   Defendants further breached the First Forbearance Agreement by failing to pay the entire indebtedness upon the occurrence of any Event of Default, including those enumerated in the preceding paragraph.

132.   As a direct and proximate result of Defendants' breaches of the First Forbearance Agreement, Bay Point has sustained damages in an amount to be determined at trial.

## COUNT SIX
### Breach of Contract – Second Forbearance Agreement
### (All Defendants)

133.   The allegations of Paragraphs 1 through 132 above are incorporated by reference as if fully set forth herein.

134.   Defendants Hoplite, Hoplite Entertainment, and Smith executed the Second Forbearance Agreement attached hereto as Exhibit I.

135.   Bay Point has performed all its obligations and conditions precedent under the Second Forbearance Agreement.

136.   Defendants breached the Second Forbearance Agreement by failing to perform certain covenants thereunder, including by (1) failing to pay the sum of $200,000 on or before December 23, 2020, (2) failing to pay the sum of $1,000,000 on or before December 31, 2020; and (3) failing to pay the sum of $1,100,000 on or before January 15, 2021.

137.   Defendants further breached the Second Forbearance Agreement by failing to pay the entire indebtedness upon the occurrence of any Event of Default, including those enumerated in the preceding paragraph.

138.   As a direct and proximate result of Defendants' breaches of the Second Forbearance Agreements, Bay Point has sustained damages in an amount to be determined at trial.

## COUNT SEVEN
### Fraudulent Misrepresentation
### (All Defendants)

139.   The allegations of Paragraphs 1 through 138 above are incorporated by reference as if fully set forth herein.

140.   By providing Bay Point with a materially fabricated License Agreement, Defendants falsely represented to Bay Point that they had receivable funds sufficient to serve as security on Bay Point's Loan to Defendants.

141.   Defendants made this misrepresentation with the knowledge that such misrepresentation was false and with the specific intent to induce Bay Point to Loan them $2 million.

142.   It was objectively reasonable for Bay Point to rely on the signed License Agreement that Defendants provided.

143.   Bay Point relied on Defendants' misrepresentation to its detriment by issuing a $2 million Loan that, had Defendants represented their true financial condition, it would not have otherwise issued, or would have issued on materially different terms.  Accordingly, Bay Point was damaged by issuing a multi-million-dollar Loan without obtaining adequate collateral security, leaving Bay Point under-secured on its Loan.

144. As a direct and proximate result of Defendants' fraudulent misrepresentation, Bay Point has sustained damages in an amount to be determined at trial.

145.   Additionally, because Defendants acted oppressively, fraudulently, and maliciously by engaging in the conduct alleged herein, Bay Point is entitled to punitive damages under NRS 42.005 for the sake of example and by way of punishing the defendant.

## COUNT EIGHT
### Unjust Enrichment
### (All Defendants)

146.   The allegations of Paragraphs 1 through 145 above are incorporated by reference as if fully set forth herein.

147.   Bay Point conferred a tangible benefit on Defendants by lending them the sum of $2 million in cash.

148.   Defendants have accepted and retained Bay Point's funds, and have enjoyed the benefit of the use of such funds.

149.   Under the present circumstances, it is inequitable for Defendants to retain the benefit of Bay Point's funds without payment for the value thereof.

150.   Accordingly, Defendants have been unjustly enriched to Bay Point's detriment, and Bay Point is entitled to just compensation in an amount to be determined at trial.

151.   Finally, because an action based on a theory of unjust enrichment is available only in the absence of an express, written contract, Bay Point's claim for unjust enrichment is pled in the alternative to Counts III, IV, V, and VI, above.

## COUNT NINE
**Appointment of Receiver**
**(All Defendants)**

152.   The allegations of Paragraphs 1 through 151 above are incorporated by reference as if fully set forth herein.

153.   This Court has the authority to appoint a receiver to assume custody, control, and management of property that is involved in litigation pursuant to Fed. R. Civ. P. 66.

154.   Section 4.1 of the Loan Agreement provides Bay Point with a security interest in Defendants' right, title, and interest in Defendants' Collateral, which

consists of several specifically enumerated pieces of tangible and intangible goods and property, including certain of Defendants' bank accounts, equipment, investments, and money, among other property.

155. Pursuant to the Loan Agreement, Bay Point's security interest in Defendants' Collateral serves as a valid, first prior security interest against the outstanding balance of the loan.

156. Defendants have defaulted on their Loan obligations to Bay Point, and Bay Point currently faces a significant risk of nonpayment on the Loan Documents.

157. Without the appointment of a receiver to protect Bay Point's security interest in Defendants' Collateral, there is a significant risk that the property will be concealed, lost, wasted, or diminished in value, leaving Bay Point inadequately secured against its impending loss.

158. Accordingly, this Court should appoint a receiver to protect fully the Collateral identified in Section 4.1 of the Loan Agreement until further order of this Court so as to avoid any further concealment, loss, waste, or diminishment in value of the property.

## COUNT TEN
### Attorneys' Fees
### (All Defendants)

159.   The allegations of Paragraphs 1 through 158 above are incorporated by reference as if fully set forth herein.

160.   Pursuant to the Loan Agreement, Note, Guaranty Agreement, and First and Second Guaranty Agreements, Defendants are required to pay Bay Point's attorneys' fees, costs, and expenses associated with this action.  (*See* Ex. E, § 11.4; Ex. F, at 2.; Ex. G, § 14; Ex. H, § 8; Ex. I, § 8.)

161.   Upon the Events of Default, the maturity of the Loan Documents and Forbearance Agreements was accelerated and the indebtedness, including Defendants' liability for Bay Point's aforementioned attorneys' fees and related costs, became immediately due and payable.

162.   Accordingly, Bay Point is entitled to its reasonable attorneys' fees and costs incurred in enforcing Defendants' obligations under the Loan Documents and Forbearance Agreements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bay Point Capital Partners II, LP respectfully requests that the Court:

(a)     Enter judgment in favor of Bay Point and against Defendants on all counts;

(b)     Award Bay Point damages in an amount not less than $2,688,611.11, including:

        (i)     $2,000,000.00 in unpaid principal under the Loan Documents;

        (ii)     $376,666.67 in standard interest;

        (iii)     $56,944.44 in default interest;

        (iv)     $230,000.00 in Late Fees; and

        (v)     $25,000.00 in legal fees.

(c)     Award Bay Point treble damages, as well as its attorneys' fees and litigation expenses, for Defendants' violations of 18 U.S.C. §§ 1962(c) and (d);

(d)     Award Bay Point its attorneys' fees and litigation expenses pursuant to the terms of the Loan Agreement, Note, Guaranty Agreement, and First and Second Forbearance Agreements;

(e)     Appoint a receiver to protect fully the Collateral identified in Section 4.1 of the Loan Agreement until further order of this Court so as to avoid any further concealment, loss, waste, or diminishment in value of the property; and

(f)     Grant such other and further relief as may be just or equitable under the circumstances.

Respectfully submitted, this 22nd day of January, 2021.

**TROUTMAN PEPPER
HAMILTON SANDERS LLP**

By: /s/ *Alexandra S. Peurach*
Harris B. Winsberg (Bar No. 770892)
harris.winsberg@troutman.com
Alexandra S. Peurach (Bar No. 451333)
alexandra.peurach@troutman.com
Christopher J. Kelleher (Bar No. 937613)
chris.kelleher@troutman.com

Bank of America Plaza
600 Peachtree Street NE
Suite 3000
Atlanta, GA  30308-2216
Telephone:      404.885.3000
Facsimile:       404.885.3900

Attorneys for Plaintiff
Bay Point Capital Partners II, LP

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BAY POINT CAPITAL PARTNERS II, LP, <br><br>       Plaintiff, <br><br> v. <br><br> HOPLITE, INC., HOPLITE ENTERTAINMENT, INC., and JONATHAN LEE SMITH, <br><br>       Defendants. | CIVIL ACTION NO. |

## **VERIFICATION**

Personally appeared before the undersigned officer duly authorized to administer oaths, Charles Andros, President and Chief Investment Officer of Plaintiff Bay Point Capital Partners II, LP, who after being duly sworn, states that the facts alleged in Plaintiff's Verified Complaint are true and correct based upon his personal knowledge and belief.

_____
Charles Andros
President and Chief Investment Officer

[Verification continues on following page]

Sworn to and subscribed
before me this 22 day
of January, 2021.

Notary Public
My commission expires: 8|4|23

Chandler Steven Rierson
NOTARY PUBLIC
DeKalb County, GEORGIA
My Commission Expires 08/04/2023