IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BAY POINT CAPITAL PARTNERS II, LP,

        Plaintiff,

v.

HOPLITE, INC., HOPLITE ENTERTAINMENT, INC., and JONATHAN LEE SMITH,

        Defendants.

CIVIL ACTION NO.
1:21-cv-00375-MLB

## VERIFIED AMENDED COMPLAINT

Plaintiff Bay Point Capital Partners II, LP (hereinafter, "Bay Point") hereby files this Verified Amended Complaint against Defendants Hoplite, Inc. ("Hoplite"), Hoplite Entertainment, Inc. ("Hoplite Entertainment"), and Jonathan Lee Smith ("Smith;" Smith, Hoplite, and Hoplite Entertainment, collectively, the "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.    This action arises out of a $2 million loan Bay Point made to Hoplite and Hoplite Entertainment in September 2020 (the "Loan"), which was guaranteed by Smith, the President and Chief Executive Officer of both entities. To obtain the

Loan, Defendants knowingly presented falsified documents to Bay Point, including falsified documents purporting to show short-term accounts receivable in excess of $3.4 million, which served as security for the Loan, as well as falsified agreements with certain of Defendants' other creditors.  After Defendants missed their very first installment payment just one month into the Loan, Defendants created multiple phony electronic funds transfer notifications and presented them to Bay Point in an effort to forestall Bay Point from foreclosing on the Loan.  Nevertheless, Bay Point endeavored to work with Defendants to secure repayment of the Loan, including by agreeing to two separate forbearance agreements in December 2020 that provided Defendants additional time to cure their numerous defaults.  All along, however, Defendants never intended to repay their debt to Bay Point; in fact, at the same time Defendants were convincing Bay Point to delay foreclosing on the Loan by presenting falsified electronic funds transfer notifications, Defendants were actively pledging the collateral that secured the Loan to a new lender.  As of the date of the filing of this Amended Complaint, Defendants have neither cured their defaults nor repaid their indebtedness to Bay Point.  Bay Point files this action seeking immediate repayment of all amounts owed under the applicable loan documents, among other relief.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Bay Point is a Delaware limited partnership with its principal place of business in Atlanta, Georgia.

3.      Defendant Hoplite is a California corporation with its principal place of business in Los Angeles, California.  Hoplite is a privately-held corporation that is 100% owned and controlled by Defendant Smith.

4.      Defendant Hoplite Entertainment is a California corporation with its principal place of business in Los Angeles, California.  Hoplite Entertainment is a privately-held corporation, and Defendant Smith is Hoplite Entertainment's controlling shareholder.

5.      Defendant Smith is an individual residing in the State of California.  In addition to serving as the sole and controlling shareholder of Hoplite and Hoplite Entertainment, respectively, Smith also serves as the President and Chief Executive Officer of both entities.

6.      Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1331 because this Court has original jurisdiction over Bay Point's claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq*.  This Court has jurisdiction over the remainder of Bay Point's claims pursuant to 28 U.S.C. § 1367(a) because all such claims are so related to the claims giving

rise to this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Defendants expressly consented to this Court's exercise of jurisdiction over them for all disputes arising out of or relating to the Loan Agreement.  (Ex. H, § 20; Ex. I, § 20; *see also* Ex. E, § 11.6(b); Ex. G, § 18(b).)

8.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Georgia.  Additionally, Defendants waived any argument that venue in this Court is not convenient.  (Ex. H, § 20; Ex. I, § 20; *see also* Ex. E, § 11.6(c); Ex. G, § 18(c).)

## **FACTUAL BACKGROUND**

*Initial Loan Discussions and Negotiation*

9.      Bay Point is a privately held investment fund specializing in short-term, secured lending to small- and medium-sized businesses that generally do not have access to traditional sources of capital.

10.     In furtherance of its lending practices, Bay Point frequently works with loan brokers who present various lending opportunities to Bay Point.  In late August 2020, Bay Point was approached by a broker named Walter Josten ("Josten").  Josten is the Founder and President of Blue Rider Pictures, a company specializing in short-

term interim financing for the film industry.  At the time, Bay Point had an ongoing relationship with Josten, and Josten was aware that Bay Point was seeking investment opportunities in the media and production industry.

11.     On August 24, 2020, two Bay Point employees, Chandler Rierson ("Rierson") and Rob Moran ("Moran"), spoke with Josten by telephone.  Josten was joined in the conversation by Max Musina ("Musina"), Josten's outside business partner.  During that conversation, Josten and Musina informed Bay Point that they were aware of a California-based media company seeking short-term financing. Specifically, Josten and Musina told Bay Point that the putative borrowers were two related, closely-held entities, Hoplite and Hoplite Entertainment, which were both under Smith's direct control and management.  Musina also indicated that he had known Smith for a long time.

*Representations of Alleged Accounts Receivable*

12.     Josten and Musina further represented to Bay Point that Hoplite, Hoplite Entertainment, and Smith had significant accounts receivable against which they were willing to borrow funds, and that they were seeking funding to sustain their operations until such receivables were realized.  In the lending industry, this type of transaction is referred to as a "bridge loan."

13.     On August 25, 2020, Josten sent a follow-up email to Rierson and Moran.  In his email, Josten recounted the substance of the prior day's telephone call and memorialized the terms of the proposed financing deal.  A true and correct copy of the email from Josten to Rierson and Moran is attached hereto as Exhibit A.

14.     In the email, Josten reiterated that Hoplite and Hoplite Entertainment were seeking immediate funding in an amount between $1 million and $2 million, and that they were willing to borrow against their then-existing short-term accounts receivable of $3,438,000.  Specifically, Josten represented that Hoplite and Hoplite Entertainment's then-existing receivables consisted of a $1,488,000 receivable from "Screen media / Crackle / Sony," a $1,000,000 receivable from "Fight Channel," and a $950,000 receivable from "Big Media / National Geographic."

15.     However, before agreeing to engage in discussions directly with Smith on behalf of Hoplite and Hoplite Entertainment, Bay Point indicated that it first needed to see documentation supporting the existence of, and amounts due and owing under, the putative borrowers' claimed accounts receivable.

16.     On August 27, 2020, Hoplite, Hoplite Entertainment, and Smith, through Josten, provided Bay Point with what they represented to be documentary proof of their then-existing short-term accounts receivable.  Included among the documents were: (1) a License Agreement between Hoplite Entertainment and Big

Media Holdings LLC ("Big Media Holdings") evidencing a purported receivable of $950,000; (2) a License Agreement between Hoplite Entertainment and Screen Media Ventures, LLC ("Screen Media Ventures") evidencing a purported receivable of $1,488,000; and (3) an Acquisition Agreement between Hoplite and Ineomeida, Inc., d/b/a Fight Channel World Network ("Fight Channel") evidencing a purported receivable of $1,000,000.  True and correct copies of the as-received documents are attached hereto as Exhibits B, C, and D, respectively.

17.    Between August 27, 2020 and September 30, 2020 (the date of the execution of the Loan Documents), Rierson and Smith had numerous telephone conversations regarding the Loan.  During those conversations, Smith affirmed the validity of the third-party agreements that had been provided to Bay Point by Josten on Defendants' behalf and reiterated that the receivable for each agreement would be due and payable to Defendants prior to the Loan's maturity date.

18.    On September 28, 2020, as part of Bay Point's pre-closing due diligence process, Rierson sent an email to Smith seeking to "outline the expected payment period for each agreement."  Later the same day, Smith responded, in writing, that Big Media Holdings was "set to pay" its purported $950,000 indebtedness to Defendants "on Oct 15th," that Fight Channel would pay its purported $1,000,000 indebtedness to Defendants "by the 15th of November," and

that Screen Media Ventures was "set to pay" its purported $1,488,000 indebtedness to Defendants "on the 30th of Oct."  A true and correct copy of the September 28, 2020 email correspondence is attached hereto as Exhibit O.

19.    Based on the purported value of the accounts receivable evidenced by the agreements Hoplite, Hoplite Entertainment, and Smith provided to Bay Point through Josten, and Smith's oral and written confirmations of the anticipated payment dates, Bay Point elected to move forward with the Loan, subject to the completion of Bay Point's due diligence process.

*Non-Disturbance, Standby, and Subordination Agreements*

20.    As part of Bay Point's due diligence process, Bay Point took steps to confirm Defendants' existing, outstanding indebtedness.  To that end, Bay Point conducted searches to locate and identify all publicly-available liens and other encumbrances filed against Hoplite, Hoplite Entertainment, and Smith.  During this process, Bay Point identified numerous liens filed against each of the Defendants, including several UCC-1 "all-asset" liens asserted against certain of the Defendants' property by secured creditors.

21.    For instance, Bay Point learned that Hoplite and Hoplite Entertainment are indebted to Columbia State Bank under the terms of a Business Loan Agreement dated April 21, 2020 (the "SBA Loan"), and Hoplite and Hoplite Entertainment are

jointly indebted to Porta Pellex LLC under the terms of Loan Agreements dated April 17, 2019 and March 22, 2020 (the "Porta Pellex Loans").

22.    Upon information and belief, Hoplite, Hoplite Entertainment, and/or Smith are, or at all relevant times hereto were, indebted to several other lenders under the terms of various financing agreements.

23.    Accordingly, as a condition precedent to making the Loan, Bay Point required Defendants to obtain certain documents from their then-existing lenders, including: (1) standby creditor's agreements, whereby Defendants' lenders agreed to accept no further payments on their respective loans until Bay Point's Loan was satisfied; and (2) debt subordination agreements, whereby certain of Defendants' secured creditors agreed to subordinate their respective contractual repayment rights and security interests to Bay Point's Loan.  Bay Point also required Defendants to obtain Columbia State Bank's express written consent prior to executing the Loan.

24.    On September 28, 2020, Smith sent an email to Rierson.  Smith attached to the email, among other things, what he purported to be the SBA Loan documents. The SBA Loan documents provided by Smith indicated that the SBA Loan is in the principal amount of $750,000 and bears a maturity date of April 21, 2021.  The purported SBA Loan documents also indicated that, as security for the SBA Loan,

Hoplite and Hoplite Entertainment pledged their interests in two television programs ("Ink Therapy III" and "We Bought a Vineyard") to Columbia State Bank.

25.   Columbia State Bank filed a UCC-1 financing statement to perfect its security interests in Hoplite and Hoplite Entertainment's property.

26.   Smith also attached to the September 28, 2020 email what he represented to be signed standby agreements from five of Defendants' creditors, including Columbia State Bank and Porta Pellex LLC.  A true and correct copy of Smith's September 28, 2020 email is attached hereto as Exhibit P.

27.   Accordingly, on September 28, 2020, Smith provided Bay Point what was purported to be Columbia State Bank's written consent to the execution of the Loan.  Smith also provided Bay Point a Standby Creditor's Agreement (the "SBA Loan Standby Agreement") in Bay Point's favor whereby Columbia State Bank agreed to subordinate its SBA Loan to Bay Point's Loan.  As part of the SBA Loan Standby Agreement, Columbia State Bank retained its priority security interests in Ink Therapy III and We Bought a Vineyard.  True and correct copies of the consent letter, SBA Loan Standby Agreement, and the SBA Loan provided by Smith to Bay Point are attached hereto as Exhibit M.

28.   Additionally, Smith attached to the September 28, 2020 email what he represented to be a Standby Creditor's Agreement in Bay Point's favor whereby

Porta Pellex LLC agreed to subordinate its Porta Pellex Loans to Bay Point's Loan (the "Porta Pellex Standby Agreement"). A true and correct copy of the Porta Pellex Standby Agreement provided by Smith to Bay Point is attached hereto as Exhibit Q.

29.  As alleged above and evidenced by Exhibit P, Smith provided several additional debt subordination and/or standby creditor's agreements in Bay Point's favor from certain other of Hoplite and/or Hoplite Entertainment's creditors, whereby such creditors purportedly agreed to subordinate their loans to Bay Point's Loan.

30.  During due diligence, Bay Point also required Defendants to obtain signed non-disturbance agreements from Big Media Holdings, Fight Channel, and Screen Media Ventures, which were to direct the third-party debtors to send all forthcoming payments from the purported accounts receivable directly to Bay Point.

31.  On September 29, 2020, Smith sent another email to Rierson. Attached to this email, Smith provided what he represented to be signed non-disturbance agreements from Big Media Holdings, Fight Channel, and Screen Media Ventures. A true and correct copy of Smith's September 29, 2020 email is attached hereto as Exhibit R.

32.    Smith attached the License Agreement between Hoplite Entertainment and Screen Media Ventures evidencing a purported receivable of $1,488,000 to the non-disturbance agreement purportedly executed by Screen Media Ventures.

33.    Smith attached the License Agreement between Hoplite Entertainment and Big Media Holdings evidencing a purported receivable of $950,000 to the non-disturbance agreement purportedly executed by Big Media Holdings.

*Execution of Loan Documents*

34.    After receipt of the required documents from Defendants and completion of its due diligence process, Bay Point entered into the Loan and Security Agreement dated September 30, 2020 (the "Loan Agreement") with Hoplite and Hoplite Entertainment, jointly and severally, pursuant to which Bay Point agreed to make a loan in the principal amount of $2 million with interest accruing each month. The Loan Agreement bore a maturity date of December 30, 2020.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit E.

35.    The Loan was evidenced by a promissory note, also in the amount of $2 million, dated September 30, 2020 (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit F.

36.    Defendant Smith guaranteed Hoplite and Hoplite Entertainment's payment and performance obligations owed to Bay Point pursuant to the Loan

Agreement and Note, as set forth in the Guaranty Agreement executed on September 30, 2020 (the "Guaranty Agreement").  A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit G.

37.     The Loan Agreement, Note, and Guaranty Agreement are hereinafter referred to as, collectively, the "Loan Documents."

38.     In the interest of convenience, Defendant Smith executed the Loan Documents, both in his individual capacity as guarantor and his representative capacity as President and Chief Executive Officer of Hoplite and Hoplite Entertainment, at Bay Point's counsel's office in Los Angeles, California.  At all relevant times hereto, Defendant Smith was aware that the original copies of the Loan Documents would be mailed from Los Angeles, California to Bay Point's principal place of business in Atlanta, Georgia, and that such mailing was a necessary prerequisite to formalizing the parties' financing agreement.

39.     On or around September 28, 2020, original copies of the signed Loan Documents were sent via FedEx overnight mail from Bay Point's counsel's office in Los Angeles, California to Bay Point's counsel's office in Richmond, Virginia for processing.  Shortly thereafter, on or around October 12, 2020, original copies of the signed Loan Documents were sent via FedEx overnight mail from Bay Point's

counsel's office in Richmond, Virginia to Bay Point's principal place of business in Atlanta, Georgia.

40.    On October 7, 2020, after execution of the Loan Documents was complete, Smith organized a meeting in Atlanta, Georgia between himself, Bay Point, and an individual named Pedro Ferre ("Ferre"), who was the Managing Director of the Turpera Group.  Smith arranged for Ferre to fly from Los Angeles, California to Atlanta, Georgia to attend the meeting.  At the meeting, Ferre indicated that he had the authority to represent Smith in Smith's business dealings with Bay Point, including with specific regard to the loan.

41.    A second face-to-face meeting between Bay Point, Ferre, and Smith occurred on November 13, 2020 in Atlanta, Georgia.

*Relevant Provisions of Loan Documents*

42.    Section 11.6(b) of the Loan Agreement provides, in relevant part, that "[e]ach Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Northern District of Georgia . . . in each case in any action or proceeding arising out of or relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby."  Pursuant to Section 11.6(c) of the Loan Agreement, Hoplite and Hoplite Entertainment further waived any objection to

venue in the United States District Court for the Northern District of Georgia, including any objection based on inconvenience of the forum.

43.     Section 2.3(a) of the Loan Agreement provides that Hoplite and Hoplite Entertainment "shall pay [Bay Point] monthly installments of accrued and unpaid interest" commencing on October 31, 2020.  Section 2.3(a) further provides that "[t]he outstanding principal balance of the Loan and all unpaid interest shall be paid in full on the Maturity Date."  As noted above, the Loan Agreement bore a maturity date of December 30, 2020.

44.     Section 2.8(c) of the Loan Agreement provides that failure to make any payment due under the Loan within five (5) days after the due date thereof will result in a late fee equal to ten percent (10%) of the amount of such late payment.

45.     Additionally, Section 2.4(b) of the Loan Agreement provides that, during the pendency of any Event of Default, all outstanding obligations will accrue interest at a rate of five percent (5%) per annum in addition to the otherwise applicable interest rate.

46.     Section 2.14(a) of the Loan Agreement provides that Hoplite and Hoplite Entertainment are "jointly and severally liable to [Bay Point] for the payment or performance of all Obligations."

47.     As a condition precedent to the Loan Agreement, Hoplite and Hoplite Entertainment were required to execute and/or obtain certain "Loan Documents." Under Section 5.3, Hoplite and Hoplite represented that "[e]ach of this Agreement and each other Loan Document to which any Borrower is a party is the legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms."

48.     Moreover, the term "Loan Document" is defined to encompass, collectively, "this Agreement, the Note and any note or notes executed by Borrower, the Related Party Subordination Agreement, the Third Party Subordination Agreement, the Collateral Documents, each Compliance Certificate, and any other agreement entered into in connection with this Agreement."  (*Id*. at 5.)

49.     The Loan Agreement provides that the receivables evidenced by the License Agreement between Hoplite Entertainment and Big Media Holdings, the License Agreement between Hoplite Entertainment and Screen Media Ventures, and the Acquisition Agreement between Hoplite and Fight Channel would serve as "Specified Collateral" on the Loan. (*See id*., § 1.1 at 7.)  The Loan Agreement also provided that, as a condition precedent, Hoplite and Hoplite Entertainment were to provide Bay Point with duly executed "Non-Disturbance Agreements," which were defined to include: (i) Non-Disturbance Agreement dated as of the Closing Date by

and between the Lender and Big Media Holdings, (ii) Non-Disturbance Agreement dated as of the Closing Date by and between the Lender and Fight Channel, and (iii) Non-Disturbance Agreement dated as of the Closing Date by and between the Lender and Big Screen Media Ventures.  (*Id*., § 1.1 at 5; § 3.1(a).)

50.    Section 2.11 of the Loan Agreement provides for the creation and maintenance of a Specified Collateral Proceeds Account to hold any funds generated by the receivables associated with the Specified Collateral accounts.  Bay Point was provided "sole access and control of" the Specified Collateral Proceeds Account. Pursuant to Section 2.11(b), any payments Hoplite and Hoplite Entertainment received from the Specified Collateral sources were to be forwarded directly into the Specified Collateral Proceeds Account, and any such funds were to be held in the Specified Collateral Proceeds Account as additional security for Bay Point. Additionally, at maturity, the funds in the Specified Collateral Proceeds Account were to be credited to Hoplite and Hoplite Entertainment's outstanding indebtedness to Bay Point.

51.    The Loan Agreement also states that Hoplite and Hoplite Entertainment were providing Bay Point with a lien and security interest in the form of a valid, first priority security interest in certain of Hoplite and Hoplite Entertainment's presently

existing and later acquired Collateral.   Specifically, Section 4.1 of the Loan

Agreement states:

> To secure prompt payment of any and all Obligations and prompt
> performance by each Borrower of each of its covenants and duties
> under the Loan Documents, each Borrower hereby grants Lender a
> continuing Lien on and security interest in all of such Borrower's right,
> title and interest in and to all of the following presently existing and
> hereafter acquired or arising property, wherever located (collectively,
> the "Collateral"): all Accounts; chattel paper (including tangible and
> electronic chattel paper); commercial tort claims; deposit accounts;
> securities accounts; documents (including negotiable documents);
> equipment (including all accessions and additions thereto); general
> intangibles (including payment intangibles and software), including,
> without limitation, the Specified Collateral; Intellectual Property;
> goods (including fixtures); instruments (including promissory notes);
> inventory (including all goods held for sale or lease or to be furnished
> under a contract of service, and including returns and repossessions);
> investment property (including securities and securities entitlements);
> letter of credit rights; money; all books and records with respect to any
> of the foregoing and the computers and equipment containing any such
> books and records; any and all cash proceeds and/or noncash proceeds
> of any of the foregoing, including, without limitation, insurance
> proceeds, and all supporting obligations and the security therefor or for
> any right to payment.

52.    Section 5.8 of the Loan Agreement further provides that Hoplite and

Hoplite Entertainment have "good title to, rights in, and the power to transfer each

item of the Collateral upon which it purports to grant a Lien hereunder and under the

other Loan Documents, free and clear of any and all Liens except Permitted Liens,"

and that "the security interest granted herein and in the other Loan Documents

constitutes a valid, first priority perfected security interest in the presently-existing

Collateral, and will constitute a valid, first priority perfected security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens."

53.    If Bay Point's first-priority security interest in the Collateral ever ceases to be in full force and effect, or if any lien on the Collateral fails to be a valid, first-priority security interest in Bay Point's favor, then an event of default under the Loan Document has occurred.  (*Id*., §§ 8.11, 8.12.)

54.    To that end, the Loan Agreement also recognizes the existence of Defendants' other debt obligations and, as a condition precedent, required that they be subordinated to Bay Point's security interest.

55.    Specifically, the Loan Agreement required execution of certain "Third Party Subordination Agreements," which were defined to include: (i) Standby Creditor's Agreement dated as of September 28, 2020 made by Turpera Group Ltd. for the benefit of the Lender, (ii) Standby Creditor's Agreement dated as of September 28, 2020 made by The Entrust Group Inc., FBO Gary Danklefsen, IRA 723xxxx for the benefit of the Lender, (iii) Standby Creditor's Agreement dated as of September 28, 2020 made by XXIII Capital Limited for the benefit of the Lender, and (iv) Standby Creditor's Agreement dated as of September 28, 2020 made by Porta Pellex, LLC for the benefit of the Lender.  (*Id*. § 1.1 at 8; 3.1(a).)

56.  The Loan Agreement also required execution of certain "Related Party Subordination Agreements," which were defined to include: (i) Subordination Agreement dated as of the Closing Date by and among Hoplite Studios, a Georgia limited liability company, Borrowers and the Lender, and (ii) Subordination Agreement dated as of the Closing Date by and among Guarantor, Borrowers and the Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.  (*Id*. § 1.1 at 7; 3.1(a).)

57.  The Loan Agreement also acknowledged the "SBA Loan," which was defined to mean "that certain loan in the principal amount of $750,000.00 made by SBA Lender to Borrower," and required Hoplite and Hoplite Entertainment to provide "evidence of the SBA Lender's consent to the Loan and the Liens granted pursuant to the Loan Documents, in form and substance satisfactory to Lender."  (*Id*., § 1.1 at 7; § 3.1(k).)

58.  The Loan Agreement also provides that, as a condition subsequent to execution of the Loan Documents, Hoplite and Hoplite Entertainment shall provide, within thirty (30) days after the Closing Date, "evidence in form satisfactory to Lender that Hoplite has satisfied (i) that certain lien in favor of the State of California Employment Development Agency, Filing Number U200003109317, filed on July 21, 2020, and (ii) that certain lien in favor of the State of California Employment

Development Agency, Filing Number U2000016410118, filed on September 4, 2020." (*Id*., § 3.2(a).)

59.     Section 8 of the Loan Agreement defines the events that constitute an "Event of Default."

60.     Under Section 8.1, any instance of Hoplite and Hoplite Entertainment's failure to pay, when due, any principal, interest, or other amounts due and payable under the Loan Agreement constitutes an independent Event of Default.

61.     If Hoplite and Hoplite Entertainment violate any provision of Section 6 or Section 7 of the Loan, they have committed an Event of Default. (*See id.*, § 8.2.)

62.     Additionally, if Hoplite and Hoplite Entertainment make "any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to [Bay Point] or to induce [Bay Point] to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is false or misleading in any material respect when made," then they have committed an Event of Default. (*See id.*, § 8.8.)

63.     Section 8.12 discusses the events of default specific to the third-party agreements discussed above, providing that an immediate event of default will occur if: (i) the Related Party Subordination Agreement, any Third Party Subordination Agreement or any other subordination agreement made in favor of the Lender shall

cease to be in full force and effect or the validity or enforceability thereof is disaffirmed by or on behalf of any subordinated lender party thereto, or (ii) any Non-Disturbance Agreement or any other non-disturbance agreement made in favor of the Lender shall cease to be in full force and effect or the validity or enforceability thereof is disaffirmed by or on behalf of any non-Lender party thereto.

64.     In the event of any Event of Default, Section 9 of the Loan Agreement provides Bay Point with several non-exclusive rights and remedies.  Under Section 9.1(a), Bay Point may declare all of Hoplite and Hoplite Entertainment's obligations immediately due and payable.  Section 9.1(b) permits Bay Point to exercise any rights and remedies available under the Loan Documents or at law or equity. Pursuant to Section 9.1(d), Bay Point may "do such acts as [Bay Point] considers necessary or reasonable to protect its security interest in the Collateral," including taking and maintaining possession of the Collateral, selling the Collateral, or disposing of the Collateral by way of one or more contracts or transactions.

65.     Section 5.17 of the Loan Agreement provides that "[n]o representation, warranty or other statement of any Obligor in any certificate or statement given to Lender, as of the date such representation, warranty, or other statement was made, taken together with all such certificates and statements given to Lender, contains any

untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not materially misleading."

66.     Section 6.8 of the Loan Agreement prohibits Hoplite and Hoplite Entertainment from changing the location of their chief executive office(s) without 15 days' prior written notice to Bay Point.

67.     Under Section 6.4, Hoplite and Hoplite Entertainment are required to make "due and timely payment" of all "federal and material state, local and other taxes, assessments, or contributions required of it by law."

68.     Pursuant to Sections 7.3 and 7.4, Hoplite and Hoplite Entertainment are prohibited from incurring, guaranteeing, or assuming any new indebtedness, as well as creating, incurring, or assuming any liens with respect to their property, except as specifically provided in the Loan Agreement.

69.     Under the Guaranty Agreement, Smith "unconditionally and irrevocably guarantee[d] to [Bay Point] the principal payment and performance of all of the obligations" owed by Hoplite and Hoplite Entertainment to Bay Point pursuant to the Loan Agreement.  (*See* Ex. G, § 1.)

70.     Smith's Guaranty Agreement includes, without limitation, the unconditional and irrevocable obligation to pay "all loans, financial accommodations, and other sums now owing or which may in the future be owing

by [Hoplite and Hoplite Entertainment] under the Loan Agreement and the other Loan Documents, as and when the same are due and payable, whether on demand, at stated maturity, by acceleration or otherwise, and whether for principal, interest, fees, expenses, indemnification or otherwise."  (*See id.*).

71.     Pursuant to Sections 2 and 3 of the Guaranty Agreement, Smith's obligations are "absolute and unconditional" and "shall remain in full force and effect until payment in full of all Guaranteed Obligations and other amounts payable under this Guaranty and until the Loan Documents are no longer in effect."

72.     Section 10 of the Guaranty Agreement provides that in the event of an Event of Default under the Loan Agreement, Bay Point is permitted "in addition to exercising any remedies set forth in this Guaranty or otherwise available at law or in equity, to accelerate Guarantor's obligations hereunder."

73.     Finally, the Note provides: "If an Event of Default shall occur and be continuing, the entire unpaid Principal Sum and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Loan Agreement."  (*See* Ex. F, at 1.)

74.     The Loan Agreement, Note, and Guaranty Agreement provide that Defendants will reimburse Bay Point for all costs and expenses incurred in enforcing

Defendants' obligations under the Loan Documents, including Bay Point's reasonable attorneys' fees.  (*See* Ex. E, § 11.4; Ex. F, at 2; Ex. G, § 14.)

75.     On October 1, 2020, Bay Point filed a California Uniform Commercial Code Financing Statement (UCC-1) with the California Secretary of State to perfect its security interests in Hoplite and Hoplite Entertainment's Collateral.

### Initial Events of Default

76.     Pursuant to Section 2.3(a) of the Loan Agreement, Hoplite and Hoplite Entertainment's first monthly installment payment of accrued and unpaid interest was due and payable on October 31, 2020.

77.     Hoplite and Hoplite Entertainment failed to pay the accrued and unpaid interest on October 31, 2020.  This constituted an "Event of Default" under Section 8.1 of the Loan Agreement.

78.     Pursuant to Section 2.3(a) of the Loan Agreement, Hoplite and Hoplite Entertainment's second monthly installment payment of accrued and unpaid interest was due and payable on November 30, 2020.

79.     Hoplite and Hoplite Entertainment failed to pay the accrued and unpaid interest on November 30, 2020.  This constituted an additional "Event of Default" under Section 8.1 of the Loan Agreement.

*Forbearance Agreements & Additional Defaults*

80.     As a result of the Events of Default, Bay Point was entitled to pursue any and all of the rights and remedies provided under Section 9 of the Loan Agreement, including the right to accelerate the entire outstanding indebtedness and the right to pursue any remedy available at law or equity against Hoplite, Hoplite Entertainment, and Smith.

81.     On several occasions during November 2020, after Defendants failed to make their first scheduled payment under the Loan Document, Bay Point's representatives spoke with Smith and/or Smith's representatives and informed them that Bay Point was within its rights to foreclose on the Loan Agreement.  In response, Smith and/or Smith's representatives assured Bay Point that payments were forthcoming and requested Bay Point to delay exercising its rights so that such payments could be made.  Bay Point agreed to delay such rights.  However, despite Smith's additional assurances—including, as discussed below, several falsified electronic funds transfer notifications—no such payments were ever made.

82.     In or around early December 2020, after missing their second scheduled payment under the Loan Agreement, Defendants requested Bay Point forbear from exercising its undisputed rights and remedies under Section 9 of the Loan Agreement.

83.     Ultimately, the parties reached a settlement that was to be memorialized in a written forbearance agreement.  In furtherance of that agreement, and consistent with the terms previously agreed upon, Bay Point drafted the forbearance agreement and sent an electronic copy of the same to Smith for execution on both his own behalf and that of Hoplite and Hoplite Entertainment.

84.     Prior to executing the forbearance agreement, Smith unilaterally and materially changed the terms of the forbearance agreement.  Specifically, Smith changed the date that the first payment was to be due from December 4, 2020, to December 11, 2020.  Smith did not inform Bay Point of the modified contractual payment terms prior to returning the executed copy of the forbearance agreement.

85.     A true and correct copy of the Forbearance Agreement dated December 4, 2020 (the "First Forbearance Agreement"), which was entered into by Bay Point, on the one hand, and Hoplite, Hoplite Entertainment, and Smith, on the other, is attached hereto as Exhibit H.

86.     Section 11(b) of the First Forbearance Agreement provides, in relevant part, that Bay Point's "execution of or performance under this Agreement does not (and it shall not be construed so as to) waive, relinquish, restrict or limit in any way any of the rights, remedies, claims or causes of action that Lender has or may have

under or with respect to the Loan Documents or applicable law (all of which are expressly reserved)."

87.    At the time the parties entered into the First Forbearance Agreement, Defendants' total outstanding indebtedness to Bay Point was $2,235,238.89, as evidenced by Recital H to the First Forbearance Agreement.  (*See* Ex. H, at 2.)

88.    Section 20 of the First Forbearance Agreement provides that "this Agreement and the Loan Documents shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of Nevada[.]"  The First Forbearance Agreement further provides that the parties consent to the personal jurisdiction of Georgia's federal and state courts and that the parties waive any challenge to the convenience of such venues.  (*See id*.)

89.    The First Forbearance Agreement further provides that, "[t]o the extent terms or provisions in this Agreement and the Loan Documents conflict or are inconsistent, the terms of this Agreement shall control."  (*See id*., § 1(d).)

90.    Pursuant to Section 2 of the First Forbearance Agreement, Bay Point agreed to forbear exercising its rights and remedies for Defendants' breaches of the Loan Documents until 4:00 p.m. on December 11, 2020.  In exchange for Bay Point's forbearance, Defendants agreed to make three payments on or before December 11, 2020: (1) a payment of $200,000 to satisfy past-due interest on the

Loan Documents (the "Forbearance Payment"); (2) a payment of $2,013,850; and (3) a payment in satisfaction of all remaining outstanding indebtedness accrued by Defendants as of such date. (*See id.*, §§ 2(e)–(g).)  As noted above, Smith unilaterally changed the date upon which the Forbearance Payment was to be paid from December 4, 2020, to December 11, 2020. (*See id*., § 2(e).)

91.    Section 4 of the First Forbearance Agreement provided that any failure to make the payments identified in Section 2(e)–(g) on or before 4:00 p.m. on December 11, 2020 would constitute an immediate Event of Default.

92.    Defendants failed to make any of the payments set forth in Section 2 of the Agreement by 4:00 p.m. on December 11, 2020.  This constituted an "Event of Default" under the First Forbearance Agreement.

93.    Accordingly, Bay Point's forbearance obligations were extinguished, and Bay Point was entitled to pursue any and all of the rights and remedies provided under Section 9 of the Loan Agreement, including the right to accelerate the outstanding indebtedness and to pursue any remedy available at law or equity against Hoplite, Hoplite Entertainment, and Smith.

94.    However, on December 18, 2020, Ferre sent an email to Charles Andros, Bay Point's President and Chief Investment Officer, purporting to be acting on Defendant Smith's behalf.  Ferre indicated that he "was able to get [Smith] to

agree to" a modified payment schedule, which Ferre stated that he believed provided "a workable and realistic solution for [Smith] to close out his debt to [Bay Point]." In conjunction with the modified payment terms set forth in his email, Ferre stated: "I am asking on his behalf for a few extra weeks."

95.    Ultimately, based, in part, on the representations made in Ferre's December 18, 2020 email on Smith's behalf, the parties reached an agreement for Bay Point to again forbear, which was to be memorialized in a second written forbearance agreement.  In furtherance of that agreement, and consistent with the terms previously agreed upon, Bay Point drafted the forbearance agreement and sent an electronic copy of the same to Smith for execution on both his own behalf and that of Hoplite and Hoplite Entertainment.

96.    Prior to executing the forbearance agreement, Smith unilaterally and materially changed the terms of the forbearance agreement.  Specifically, Smith changed the date that the first payment was to be due from December 21, 2020, to December 23, 2020.  Smith did not inform Bay Point of the modified contractual payment terms prior to returning the executed copy of the forbearance agreement to Bay Point.

97.    A true and correct copy of the Forbearance Agreement dated December 21, 2020 (the "Second Forbearance Agreement") is attached hereto as Exhibit I.

98.    On December 22, 2020, Defendants sent the original executed copy of the Second Forbearance Agreement via FedEx overnight mail from Hollywood, California to Bay Point's principal place of business in Atlanta, Georgia.

99.    Section 11(b) of the Second Forbearance Agreement provides, in relevant part, that Bay Point's "execution of or performance under this Agreement does not (and it shall not be construed so as to) waive, relinquish, restrict or limit in any way any of the rights, remedies, claims or causes of action that Lender has or may have under or with respect to the Loan Documents or applicable law (all of which are expressly reserved)."

100.    At the time the parties entered into the Second Forbearance Agreement, Defendants' total outstanding indebtedness to Bay Point was $2,517,618.89, as provided in Recital I of the Second Forbearance Agreement.  (*See* Ex. I, at 2.)

101.    Section 20 of the Second Forbearance Agreement provides that "this agreement and the loan documents shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of Nevada[.]" (capitalization omitted).  The Second Forbearance Agreement further provides that the parties consent to the personal jurisdiction of Georgia's federal and state courts and that the parties waive any challenge to the convenience of such venues.  (*See id*.)

102.   The Second Forbearance Agreement also provides that "[t]o the extent terms or provisions in this Agreement and the Loan Documents conflict or are inconsistent, the terms of this Agreement shall control."  (*See id.*, § 1(d).)

103.   Pursuant to Section 3 of the Second Forbearance Agreement, Bay Point agreed to forbear exercising its rights and remedies for Defendants' breaches of the Loan Documents until 4:00 p.m. on January 15, 2021, provided that no Event of Default occurred before such date.   In exchange for Bay Point's forbearance, Defendants agreed to make three payments: (1) a payment of $200,000 on or before December 23, 2020, to satisfy past-due interest on the Loan Documents (the "Forbearance Payment"); (2) a payment of $1,000,000 on or before December 31, 2020; and (3) a payment of $1,100,000 on or before January 15, 2021.  If Defendants made all three payments, then Bay Point agreed to waive all remaining indebtedness on the Loan Documents.  (*See id.*, § 4.)  As noted above, Smith unilaterally changed the date upon which the Forbearance Payment was to be paid from December 21, 2020, to December 23, 2020.  (*See id.*, § 2(e).)

104.   Section 5 of the Second Forbearance Agreement provided that any failure to make the payments identified in Section 3 on or before the date identified therein would constitute an immediate Event of Default, entitling Bay Point to again pursue all available remedies under the Loan Agreement and at law or equity.

105.   Defendants failed to make the payments set forth in Sections 3(a)–(b) of the Second Forbearance Agreement by the dates set forth therein.  These failures to meet the payment deadlines constituted additional "Events of Default" under the Second Forbearance Agreement.  Additionally, pursuant to Section 6 of the Second Forbearance Agreement, Defendants' failure to make timely payments resulted in the immediate acceleration of the entire outstanding indebtedness.

106.   Accordingly, Bay Point's forbearance obligations were again extinguished, and Bay Point was entitled to pursue any and all of the rights and remedies provided under Section 9 of the Loan, including the right to pursue any remedy available at law or equity against Hoplite, Hoplite Entertainment, and Smith.

107.   To date, Defendants have not repaid any of their outstanding indebtedness to Bay Point, including the principal, interest, late fees, attorneys' fees, and other related costs and expenses.

*Defendants' Fraudulent Scheme Unravels*

108.   Defendants induced Bay Point into loaning them $2 million by, among other things,: (1) representing to Bay Point that they had at least $3,438,000 in then-existing short-term accounts receivable from their prior agreements with three outside parties; (2) providing Bay Point with what were represented to be true and accurate copies of these agreements; (3) providing Bay Point with what were

represented to be true and accurate copies of various stand-by creditor's agreements, debt subordination agreements, and a loan consent letter; (4) providing Bay Point with what were represented to be the underlying SBA Loan documents; and (5) providing Bay Point with what was represented to be a valid, first-priority security interest in the Collateral.

109.   After Defendants defaulted on their payment obligations under the Loan Documents, Defendants bought themselves additional time by providing Bay Point with certain falsified electronic funds transfer notifications and, later, by materially and unilaterally changing the payment terms of the First and Second Forbearance Agreements.

*(1) Falsified ACH and Wire Transfer Confirmations*

110.   In furtherance of their scheme to induce Bay Point to lend them $2 million, Defendants agreed to assign the rights to payment of their outstanding accounts receivable to Bay Point as "Specified Collateral" on the Loan.  Thus, in accordance with Section 2.11 of the Loan Agreement and the respective non-disturbance agreements, any payments made to Hoplite or Hoplite Entertainment under the third-party agreements specified above were to be made either (1) directly to Bay Point by the third-party debtors, or (2) to Hoplite and Hoplite Entertainment, who were then obligated to remit the funds to Bay Point.  In either instance, all such

funds were to be held in the Specified Collateral Proceeds Account and, subject to several enumerated exceptions, would ultimately be used to satisfy Hoplite and Hoplite Entertainment's indebtedness to Bay Point.

111.   Based on Smith's prior representations, Bay Point anticipated that Big Media Holdings would make its payment on October 15, 2020, that Screen Media Ventures would make its payment on October 30, 2020, and that Fight Channel would make its payment on November 15, 2020.  (*See* Ex. O.)

112.   No payments were received on or before the dates Smith represented that such payment obligations would be fulfilled.  After confronting Smith with this information and threatening to foreclose on the Loan Documents, Smith indicated that the payments were imminent.

113.   Thus, on November 17, 2020, at 10:19 a.m., Defendant Smith sent an email to Rierson and Moran, who, as noted above, are the Bay Point employees primarily responsible for the relationship with Defendants.  A true and correct copy of the email correspondence is attached hereto as Exhibit J.

114.   Smith's email represented that he was forwarding an earlier message from Seth Needle, a Screen Media Ventures executive, to Smith, which showed what appeared to be the confirmation of an outgoing Wells Fargo automated clearing house (ACH) transfer, which is a type of electronic funds transfer.  The amount of

the alleged ACH transfer was $1,488,000, which constituted the full amount purportedly owed to Hoplite Entertainment under its prior agreement with Screen Media Ventures, and to which Bay Point had a priority claim pursuant to Section 2.11 of the Loan Agreement and the Non-Disturbance Agreement.  Moreover, the account number shown as the recipient of the ACH transfer was a bank account belonging to Bay Point, making it appear as if Screen Media Ventures had initiated a payment of $1,488,000 directly to Bay Point.

115.   At the time Smith sent the November 17, 2020 email to Bay Point, Defendants were already in default on the Loan Documents after failing to make the October 31, 2020 installment payment, and the date upon which Smith represented that Screen Media Ventures would make their payment under the License Agreement had passed.

116.   Additionally, in the nearly two months since the Loan Documents had been signed, no funds had been deposited in the Specified Collateral Proceeds Account either directly from the third-party debtors or indirectly through Hoplite and Hoplite Entertainment.

117.   Thus, Bay Point was initially relieved to receive Smith's email, which made it appear as though $1,488,000 would be deposited into Bay Point's bank account within a matter of days.

118.   Bay Point never received the funds shown in the purported ACH transfer.

119.   Two weeks later, on December 1, 2020, Rierson forwarded Smith's November 17, 2020 email correspondence directly to Seth Needle at Screen Media Ventures and asked Mr. Needle to call him to discuss Screen Media Ventures' purported ACH transfer to Hoplite on November 17, 2020.  (*See* Ex. J.)

120.   Rierson contacted Mr. Needle because, prior to entering the Loan Agreement, Smith arranged a telephone conference between Rierson and an individual who represented himself to be Mr. Needle, so that Rierson could verify the terms of Screen Media Ventures' License Agreement with Hoplite Entertainment.

121.   Later that same day, Mr. Needle responded to Rierson via email, writing: "Unfortunately, it appears this is a scam, as I did not ever send any such email."  (*See id.*)

122.   Upon information and belief, Defendants fabricated the Wells Fargo ACH transfer confirmation, including by making it appear as though Screen Media Ventures had electronically transferred to Bay Point's bank account the precise amount of its purported indebtedness under the License Agreement with Hoplite Entertainment.   Defendants then sent a copy of the fraudulent ACH transfer

notification to Bay Point via email in order to convince Bay Point not to foreclose on the Loan Documents, which were then in default.

123.   In the interim, Smith forwarded another funds transfer confirmation to Rierson and Moran at Bay Point on November 20, 2020, which showed that a wire transfer had been initiated and was being processed.  A true and correct copy of the November 20, 2020 email correspondence is attached hereto as Exhibit K.

124.   The wire transfer initiation notification indicated that Defendants were in the process of wiring $100,000 directly to Bay Point's bank account, and that the funds would be deposited on November 23, 2020.

125.   Again, however, Bay Point never received the funds reflected in the purported wire transfer notification.

126.   Upon information and belief, Defendants also fabricated this second Wells Fargo wire transfer confirmation in an effort to further convince Bay Point not to exercise its remedies under the Loan Documents, which remained in default.

*(2) Falsified License Agreements*

127.   After Bay Point learned that the purported ACH funds transfer from Screen Media Ventures was fraudulent, Rierson asked Seth Needle to send Bay Point a copy of Screen Media Ventures' License Agreement with Hoplite Entertainment.

128.   On December 2, 2020 at 10:58 a.m., Mr. Needle responded to Rierson via email.  Attached to Mr. Needle's email correspondence was a copy of Screen Media Ventures' License Agreement with Hoplite Entertainment.  A true and correct copy of the License Agreement provided by Mr. Needle is attached hereto as Exhibit L.

129.   The License Agreement provided by Screen Media Ventures via email on December 2, 2020 was nearly identical to the one previously provided to Bay Point by Defendants during the initial Loan negotiations, with two glaring exceptions: There was no Section 2(c) requiring advance payments (pg. 1), and in Exhibit A of the License Agreement (pg. 4), there was no mention of the $1,488,000 monetary advance.  These terms, however, appeared in the copy of the License Agreement that Defendants provided to Bay Point during their prior Loan negotiations as proof of a then-existing short-term account receivable.  (*Compare* Ex. C, at 1 & 4, *with* Ex. L, at 1 & 4.)

130.   Upon information and belief, Defendants fraudulently added material terms to the version of the License Agreement with Screen Media Ventures provided to Bay Point in order to make it appear as if Screen Media Ventures had agreed to advance Hoplite Entertainment the sum of $1,488,000, when Screen Media Ventures

had not.  Upon further information and belief, Defendants forged Screen Media Ventures' signatures in the version of the License Agreement provided to Bay Point.

131.   Defendants then used that falsified License Agreement to induce Bay Point to lend them the sum of $2 million, and gave Bay Point "security" in the form of a priority right to a receivable that did not exist.

132.   Upon information and belief, Defendants also falsified the non-disturbance agreement from Screen Media Ventures that Smith sent Bay Point on September 28, 2020 (*see* Ex. R), which attached a version of the falsified License Agreement and purported to be executed by Screen Media Ventures.

133.   Following receipt of Mr. Needle's December 1, 2020 email in which Mr. Needle informed Rierson that the purported ACH transfer appeared to be a "scam," Rierson spoke to Mr. Needly by phone.  Rierson did not recognize Mr. Needle's voice to be the same as the individual he had spoken to previously, in the telephone conference arranged by Smith.  Mr. Needle confirmed that he had never previously spoken to Rierson, and that he did not participate in the earlier call arranged by Smith.

134.   On March 1, 2021, a representative of Big Media Holdings confirmed to Bay Point that the License Agreement between Big Media Holdings and Hoplite

Entertainment that Defendants previously provided to Bay Point (*see* Ex. B) was falsified.

135.   Specifically, the Big Media Holdings representative confirmed that Big Media Holdings and Hoplite Entertainment were parties to a License Agreement, but that the License Fee under the true and correct License Agreement was $11,000, rather than the $950,000 License Fee evidenced by the version of the License Agreement Defendants provided to Bay Point.

136.   Upon information and belief, Defendants fraudulently added material terms to the version of the License Agreement with Big Media Holdings provided to Bay Point in order to make it appear as if Big Media Holdings had agreed to pay a License Fee of $950,000, when Big Media Holdings had not.

137.   Defendants then used that falsified License Agreement to induce Bay Point to lend them the sum of $2 million, and gave Bay Point "security" in the form of a priority right to a receivable that was fraudulently overstated by $939,000.

138.   Upon information and belief, Defendants also falsified the non-disturbance agreement from Big Media Holdings that Smith sent Bay Point on September 28, 2020 (*see* Ex. R), which attached a version of the falsified License Agreement and purported to be executed by Big Media Holdings.

*(3) Falsified Standby, Subordination, and Consent Agreements*

139.   On February 9, 2021 at 8:00 p.m., counsel for Bay Point received an email from counsel for Columbia State Bank, Jane Pearson.  A true and correct copy of the email correspondence from Ms. Pearson is attached hereto as Exhibit S.

140.   In the email, Ms. Pearson represented that the consent letter and Standby Creditor's Agreement provided by Defendants to Bay Point and represented to be from Columbia State Bank were "**falsely fabricated, do not contain signatures of representatives of Columbia Bank, are not part of loan documents between Columbia Bank and Hoplite, are not authorized by Columbia Bank, and are ineffective.**"  (*See* Ex. S at 1 (emphasis original).)

141.   Ms. Pearson further indicated that the loan documents provided by Defendants to Bay Point and attached to the Standby Creditor's Agreement "**are not true copies of the Business Loan Agreements between Columbia Bank and the Hoplite entities and were not signed by Lindsey Purdy on behalf of Columbia Bank.**"  (*Id*. (emphasis original).)

142.   In light of the allegedly-falsified Standby Creditor's Agreement, Ms. Pearson also stated that "Columbia Bank's perfected security interest in the Collateral (as defined in the Complaint) is senior to that of Bay Point Capital Partners II, L.P., as a review of the UCC-1 filings reveals."  (*Id*.)

143.   On February 17, 2021, Rierson emailed Kristofer Larson, legal counsel for Porta Pellex LLC, requesting a telephone call to discuss Porta Pellex's investment in Hoplite Entertainment.  Rierson and Mr. Larson spoke by phone that same day.   During the telephone call, Rierson asked Mr. Larson to confirm the validity of the Porta Pellex Standby Agreement that Defendants had provided to Bay Point, and Mr. Larson asked Mr. Rierson to send him a copy of the purported Porta Pellex Standby Agreement to review.  Accordingly, Rierson sent Mr. Larson a copy of the Porta Pellex Standby Agreement via email and asked Mr. Larson to "[p]lease confirm via email the validity of this document."

144.   On February 17, 2021 at 6:49 p.m., Mr. Larson responded to Rierson, stating: "Thanks for sending the standby agreement. I have never seen it; Noah Bronstein does not have authority to sign anything on behalf of Porta Pellex; and most importantly, Noah did not sign it. I believe someone signed it that was not Noah and did so without Noah's knowledge or consent."

145.   A true and correct copy of the email correspondence between Rierson and Mr. Larson is attached hereto as Exhibit T.

146.   Upon information and belief, and in light of the representations made by Ms. Pearson and Mr. Larson, Defendants falsified the Columbia State Bank

consent letter and Standby Creditor's Agreement, as well as the Porta Pellex Standby Agreement, and forged the signatures of the respective signatories of the documents.

147.   Defendants provided these documents to Bay Point to induce Bay Point to enter into the Loan Agreement, and Defendants were obligated to provide "duly executed" copies of such documents as a condition precedent to the Loan Agreement.

148.   Defendants relied on these falsified documents to their detriment in deciding to proceed with making the Loan to Defendants.

*(4) Failure to Provide and Maintain Valid, First-Priority Security Interest*

149.   Under the Loan Agreement, Hoplite and Hoplite Entertainment warranted that "the security interest granted herein and in the other Loan Documents constitutes a valid, first priority perfected security interest in the presently-existing Collateral, and will constitute a valid, first priority perfected security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens." (Ex. E, § 5.8.)   Hoplite and Hoplite Entertainment also agreed to "defend such security interest against the claims and demands of all Persons whomsoever."  (*Id*., § 6.7.)

150.   However, by falsifying the Standby Creditor's Agreement from Columbia State Bank, a secured creditor with a perfected security interest in at least

some of the same collateral later pledged to Bay Point, Defendants failed to provide "a valid, first priority perfected security interest in the presently-existing Collateral."

151.   On December 8, 2020, an entity named Bondit LLC filed a UCC-1 Financing Statement with the California Secretary of State.  The UCC-1 Financing Statement indicated that Hoplite Entertainment provided Bondit LLC with "a first priority security interest in, and all of the Debtors' right, title and interest in, to and under all property, tangible and intangible . . . as collateral security to secure the payment and performance in full of all the Obligations to the Secured Party."  A true and correct copy of the Bondit LLC UCC-1 Financing Statement is attached hereto as Exhibit U.

152.   Bay Point did not consent to subordinate its security interest in Defendants' Collateral to any subsequent lender, including Bondit LLC.

*Hoplite Entertainment's Incorporation is Suspended*

153.   On or about October 1, 2020, Hoplite Entertainment's incorporation with the California Secretary of State was changed from "Active" to "FTB Suspended."  This status change indicates that "[t]he business entity was suspended . . . by the Franchise Tax Board for failure to meet tax requirements (e.g., failure to file a return, pay taxes, penalties, interest)."  As a result of its failure to meet certain

of its tax obligations, Hoplite Entertainment's powers, rights, and privileges, which include the right to use the entity's name in California, were suspended.

154.   On or around the week of March 1, 2021, Hoplite Entertainment's incorporation with the California Secretary of State was changed from "FTB Suspended" to "Active."

<p align="center">*Defendants' Purported Office is Closed*</p>

155.   During the due diligence process, Smith represented that Defendants' business operations were conducted from a single office located at 6725 Sunset Boulevard, Suite 250, Los Angeles, California 90028.   This was also listed as Defendants' "Chief Executive Office" in the Loan Agreement.   (*See* Ex. E at Schedule 6.8.)

156.   On February 11, 2021, counsel for Defendants represented that, several months prior, Defendants had closed their "Chief Executive Office" and were no longer in possession of a physical place of business.  Instead, counsel for Defendants represented that Smith was managing Hoplite and Hoplite Entertainment's business operations from his personal residence.

157.   Defendants did not previously inform Bay Point that they were closing their "Chief Executive Office" or that Hoplite and Hoplite Entertainment's business operations would be managed from Smith's personal residence.

*Failure to Resolve Tax Liens & Satisfy Tax Obligations*

158.   Defendants were required to satisfy certain tax liens filed against Hoplite by the State of California Employment Development Department within 30 days of execution of the Loan Agreement.  (*See* Ex. E, § 3.2(a).)

159.   Upon information and belief, Defendants failed to satisfy the tax liens identified in Section 3.2 of the Loan Agreement within 30 days of the execution thereof, or at any time thereafter.

160.   Additionally, Section 6.4 of the Loan Agreement required Hoplite and Hoplite Entertainment to timely pay all taxes as they became due.  (*Id*., § 6.4.)

161.   However, several additional tax liens were filed against Hoplite as a result of Hoplite's nonpayment of certain of its tax obligations, including: (1) a tax lien in the amount of $15,324.93 filed by the State of California Employment Development Department on September 10, 2020; (2) a tax lien in the amount of $9,127.08 filed by the State of California Franchise Tax Board on December 2, 2020; (3) a tax lien in the amount of $12,197.51 filed by the State of California Employment Development Department on December 11, 2020; and (4) a tax lien in the amount of $12,195.51 filed by the State of California Employment Development Department on December 14, 2020.  As of January 21, 2021, each of those tax liens remains outstanding.

*Continuing Default and Amounts Owed*

162.   As of the date of the filing of this Verified Complaint, Defendants Hoplite, Hoplite Entertainment, and Smith remain in default on the Loan Documents, as well as the First and Second Forbearance Agreements. Additionally, upon committing an Event of Default under the Second Forbearance Agreement, the entire outstanding indebtedness was automatically accelerated and became immediately due and payable.

163.   As of March 8, 2021, the total amount owed under the Loan Documents and First and Second Forbearance Agreements, exclusive of attorneys' fees which have accrued and which continue to accrue, is $2,863,611.11 (the "Indebtedness"). The Indebtedness is comprised of:

(a)    $2,000,000 in principal and $526,666.67 in interest thereon, which continues to accrue at the fixed rate of five (5) percent per month;

(b)    $106,944.44 in default interest, which accrued at a rate of five (5) percent per annum from November 4, 2020 to December 11, 2020, and which continues to accrue at a rate of twenty (20) percent from December 12, 2020 to present, in addition to the otherwise applicable interest rate on the principal balance of the Loan Documents; and

(c)    $230,000.00 in Late Fees.

## COUNT ONE
### Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(c)
### (All Defendants)

164.   The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

165.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is, and at all relevant times hereto was, an individual or entity capable of holding a legal or beneficial interest in property.

166.   As detailed above and herein, Defendants collectively formed an "enterprise" within the meaning of 18 U.S.C. § 1961(4) in that they are a group of individuals and corporations associated in fact, although not a single legal entity.  At all relevant times hereto, Defendants' enterprise was engaged in interstate commerce to facilitate, manage, establish, and carry on their enterprise's fraudulent scheme.

167.   Defendants formed a common scheme and enterprise for the common purpose of fraudulently inducing Bay Point to convey $2 million to Defendants, when Defendants had no intention of repayment of such funds, and inducing Bay Point to forbear from foreclosing on the Loan Agreement.

168.   Each of the Defendants conducted and participated in the operations of the enterprise through a "pattern of racketeering activity" within the meaning of 18

U.S.C. §§ 1962(c) and 1961(5), including by engaging in acts indictable as wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341.

169.   In furtherance of their enterprise, Defendants transmitted fraudulent documents and representations to Bay Point through the means of wire communication in violation of 18 U.S.C. § 1343.  Specifically, and as detailed at length above, on August 27, 2020, Defendants caused the enterprise to send to Bay Point by electronic mail two fraudulent License Agreements purporting to evidence accounts receivable of $1,488,000 and $950,000, respectively, for the sole purpose of inducing Bay Point to make a Loan to Defendants in the amount of $2 million. As further detailed above, on September 28, 2020, Defendants caused the enterprise to send to Bay Point by electronic mail several fraudulent Standby Creditor's Agreements and a fraudulent lender consent letter from Columbia State Bank for the sole purpose of inducing Bay Point to make a Loan to Defendants in the amount of $2 million.

170.   Additionally, as detailed above, on November 17, 2020, and November 20, 2020, Defendants caused the enterprise to send to Bay Point by electronic mail two fraudulent electronic payment confirmations evidencing electronic funds transfers that, in reality, were never sent.  Defendants did so for the sole purpose of

furthering their scheme to avoid repayment of Bay Point's $2 million Loan to Defendants.

171.   In furtherance of their scheme, Defendants also sent documents through the United States Postal Service and/or private or commercial interstate carriers in violation of 18 U.S.C. § 1341.  Specifically, on or about September 28, 2020, Defendant Smith signed the Loan Agreement, Note, and Guaranty Agreement with the understanding that the original copies of such documents would be transmitted from California to Bay Point's principal place of business in Atlanta, Georgia by the United States Postal Service or a private or commercial interstate carrier and that such cross-country transmission of the original documents was a necessary prerequisite to formalizing the lending agreement.  And, consistent with Defendants' understanding, the original copies of the Loan Documents were sent via FedEx overnight mail to Bay Point's counsel's office in Richmond, Virginia for processing on or around September 28, 2020, and were then sent via FedEx overnight mail from Bay Point's counsel's office in Richmond, Virginia to Bay Point's principal place of business in Atlanta, Georgia on or around October 12, 2020.

172.   Additionally, on December 22, 2020, Defendants sent the original copy of the Second Forbearance Agreement, which contained payment terms that

Defendants had unilaterally and materially altered, via FedEx overnight mail from Hollywood, California to Bay Point's principal place of business in Atlanta, Georgia.

173.  Defendants' fraudulent acts, including Defendants' multiple commissions of wire fraud and mail fraud, formed a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  Such acts were interrelated by virtue of common participants, a common victim, a common method of commission and course of conduct, and the common purpose and common result of defrauding Bay Point of $2 million and enriching the Defendants at Bay Point's expense while concealing their fraudulent activities.

174.  As a direct and proximate result of the racketeering activity engaged in by Defendants' fraudulent enterprise, Bay Point suffered injury to its business or property within the meaning of 18 U.S.C. § 1964(c).

175.  Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to Bay Point for three times the damages sustained, as well as Bay Point's litigation costs and reasonable attorneys' fees.

## <u>COUNT TWO</u>
**Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(d) – Conspiracy**
**(All Defendants)**

176.  The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

177.   Section 1962(d) prohibits any person from conspiring with other persons to violate 18 U.S.C. § 1962(c).

178.   As detailed above and herein, Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to engage in a common scheme and enterprise for the common purpose of obtaining funds from Bay Point through a pattern of racketeering activity, including but not limited to the transmission of fraudulent, forged, or otherwise falsified documents and other communications to Bay Point by wire and mail.

179.   Defendants knew their common scheme and enterprise was part of a pattern of racketeering activity and agreed to the commission of those acts to accomplish the goals of their fraudulent enterprise.

180.   Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

181.   As a direct and proximate result of Defendants' conspiracy, and the overt acts taken in furtherance of that conspiracy, Bay Point suffered injury to its business or property as set forth above.

182.   Because of Defendants' violations of 18 U.S.C. § 1962(d), Defendants are liable to Bay Point for three times the damages sustained, as well as Bay Point's litigation costs and reasonable attorneys' fees.

<div align="center">

**COUNT THREE**
**Breach of Contract – Loan Agreement and Note**
**(Defendants Hoplite and Hoplite Entertainment)**

</div>

183.   The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

184.   Defendants Hoplite and Hoplite Entertainment executed the Loan Agreement and Note attached hereto as Exhibits E and F, respectively.

185.   Bay Point has performed all of its obligations and conditions precedent under the Loan Agreement and Note.

186.   Defendants Hoplite and Hoplite Entertainment breached the Loan Agreement and Note by failing to perform certain covenants thereunder, including by: (1) failing to pay the interest payments due on October 31, 2020, and November 30, 2020; (2) failing to pay the entire indebtedness immediately upon the occurrence of several Events of Default; (3) failing to pay the entire indebtedness on the Maturity Date;  (4) purporting to grant a first-priority security interest in property that was subject to a prior encumbrance without providing valid lien subordination; (5) failing to defend Bay Point's first-priority security interest against a subsequent

creditor; (6) making false representations in statements made to Bay Point; (7) closing their chief executive office without giving prior written notice to Bay Point; (8) incurring new indebtedness without Bay Point's written consent; (9) failing to provide "duly executed" and "legal, valid and binding" non-disturbance, subordination, and stand-by creditor's agreements to Bay Point; (10) failing to satisfy certain tax liens filed by the State of California within 30 days of execution of the Loan Documents; and (11) failing to make certain timely tax payments when due, resulting in the filing of additional tax liens against Hoplite.

187.   As a direct and proximate result of Defendants Hoplite and Hoplite Entertainment's breaches of the Loan Agreement and Note, Bay Point has sustained damages in an amount to be determined at trial.

188.   Pursuant to the Loan Agreement, Defendants Hoplite and Hoplite Entertainment are jointly and severally liable for any such damages awarded to Bay Point.

<div align="center">

**COUNT FOUR**
**Breach of Contract—Guaranty Agreement**
**(Defendant Smith)**

</div>

189.   The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

190.    Defendant Smith executed the Guaranty Agreement attached hereto as Exhibit G.

191.    Pursuant to the Guaranty Agreement, Smith is unconditionally and irrevocably obligated to pay all obligations of Hoplite and Hoplite Entertainment under the Loan Agreement and other Loan Documents, including the payment of all principal, interest, fees, and expenses whenever any such obligations become due and payable.

192.    Smith breached the Guaranty Agreement by failing to pay Hoplite and Hoplite Entertainment's entire indebtedness upon the occurrence of any of the Events of Default.

193.    Smith further breached the Guaranty Agreement by failing to pay the entire outstanding balance of the Loan Documents on the Maturity Date, or at any time thereafter.

194.    As a direct and proximate result of Smith's breaches of the Guaranty Agreement, Bay Point has sustained damages in an amount to be determined at trial.

**COUNT FIVE**
**Breach of Contract – First Forbearance Agreement**
**(All Defendants)**

195.    The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

196.   Defendants Hoplite, Hoplite Entertainment, and Smith executed the First Forbearance Agreement attached hereto as Exhibit H.

197.   Bay Point has performed all its obligations and conditions precedent under the First Forbearance Agreement.

198.   Defendants breached the First Forbearance Agreement by failing to perform certain covenants thereunder, including by (1) failing to pay the sum of $200,000 on or before December 11, 2020, (2) failing to pay the sum of $2,013,850 on or before December 11, 2020, and (3) failing to pay the entire outstanding indebtedness by 4:00 p.m. on December 11, 2020, as provided by Section 2(g) of the First Forbearance Agreement.

199.   Defendants further breached the First Forbearance Agreement by failing to pay the entire indebtedness upon the occurrence of any Event of Default, including those enumerated in the preceding paragraph.

200.   As a direct and proximate result of Defendants' breaches of the First Forbearance Agreement, Bay Point has sustained damages in an amount to be determined at trial.

## COUNT SIX
## Breach of Contract – Second Forbearance Agreement
## (All Defendants)

201.   The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

202.   Defendants Hoplite, Hoplite Entertainment, and Smith executed the Second Forbearance Agreement attached hereto as Exhibit I.

203.   Bay Point has performed all its obligations and conditions precedent under the Second Forbearance Agreement.

204.   Defendants breached the Second Forbearance Agreement by failing to perform certain covenants thereunder, including by (1) failing to pay the sum of $200,000 on or before December 23, 2020, (2) failing to pay the sum of $1,000,000 on or before December 31, 2020; and (3) failing to pay the sum of $1,100,000 on or before January 15, 2021.

205.   Defendants further breached the Second Forbearance Agreement by failing to pay the entire indebtedness upon the occurrence of any Event of Default, including those enumerated in the preceding paragraph.

206.   As a direct and proximate result of Defendants' breaches of the Second Forbearance Agreements, Bay Point has sustained damages in an amount to be determined at trial.

## COUNT SEVEN
### Fraudulent Misrepresentation
### (All Defendants)

207.   The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

208.   As alleged herein, Defendants made, or caused to be made, several material misrepresentations to Bay Point, including but not limited to: (1) providing Bay Point with a materially fabricated License Agreement with Screen Media Ventures; (2) providing Bay Point with a materially fabricated non-disturbance agreement from Screen Media Ventures; (3) providing Bay Point with a materially fabricated License Agreement with Big Media Holdings; (4) providing Bay Point with a materially fabricated non-disturbance agreement from Big Media Holdings; (5) providing Bay Point with a materially fabricated consent letter from Columbia State Bank; (6) providing Bay Point with materially fabricated standby creditor's agreements from Columbia State Bank and Porta Pellex LLC; (7) providing Bay Point with materially fabricated SBA Loan documents; (8) providing Bay Point with materially fabricated electronic funds transfer notifications; and (9) falsely representing to Bay Point the amounts and expected dates that payments were to be received from Screen Media Ventures, Big Media Holdings, and Fight Channel under their respective license agreements.

209.   By providing Bay Point with materially fabricated License Agreements with Screen Media Ventures and Big Media Holdings and materially fabricated non-disturbance agreements from Screen Media Ventures and Big Media Holdings, as well as falsely misrepresenting the amounts and expected dates that payments were to be received from Screen Media Ventures, Big Media Holdings, and Fight Channel under their respective license agreements, Defendants falsely represented to Bay Point that they had receivable funds sufficient to serve as security on Bay Point's Loan to Defendants.

210.   By providing Bay Point with a materially fabricated consent letter and several materially fabricated standby creditor's agreements, Defendants falsely represented to Bay Point that they were able to provide Bay Point with a valid, first-priority security interest in the Collateral.

211.   By providing Bay Point with materially fabricated electronic funds transfer notifications, Defendants falsely represented to Bay Point that Defendants were, or imminently would be, paying their debt obligations to Bay Point.

212.   Defendants made these misrepresentations with the knowledge that such misrepresentations were false and with the specific intent to induce Bay Point to Loan them $2 million and, later, to forbear from foreclosing on the Loan Agreement.

213.   It was objectively reasonable for Bay Point to rely on the signed License Agreements, non-disturbance agreements, consent letter, standby creditor's agreements, electronic funds transfer notifications, and statements of anticipated payments that Defendants provided.

214.   Bay Point relied on Defendants' misrepresentations to its detriment by (1) issuing a $2 million Loan that, had Defendants represented their true financial condition and the positions taken by Defendants' then-existing creditors, it would not have otherwise issued, or would have issued on materially different terms, and (2) forbearing from foreclosing on the Loan Agreement at a time that Defendants may have had sufficient assets to satisfy their debt obligations and during which time Defendants were actively pledging the Collateral to a subsequent lender. Accordingly, Bay Point was damaged by issuing a multi-million-dollar Loan without obtaining adequate collateral security, leaving Bay Point under-secured on its Loan, and by later postponing its right to foreclose on the Loan Agreement at a time when Defendants may have had assets sufficient to satisfy their outstanding indebtedness to Bay Point and prior to the time that a subsequent lender filed a UCC-1 Financing Statement claiming a priority security interest in the Collateral.

215.   As a direct and proximate result of Defendants' fraudulent misrepresentations, Bay Point has sustained damages in an amount to be determined at trial.

216.   Additionally, because Defendants acted oppressively, fraudulently, and maliciously by engaging in the conduct alleged herein, Bay Point is entitled to punitive damages under Nev. Rev. Stat. 42.005 for the sake of example and by way of punishing Defendants.

## COUNT EIGHT
### Unjust Enrichment
### (All Defendants)

217.   The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

218.   Bay Point conferred a tangible benefit on Defendants by lending them the sum of $2 million in cash.

219.   Defendants have accepted and retained Bay Point's funds, and have enjoyed the benefit of the use of such funds.

220.   Under the present circumstances, it is inequitable for Defendants to retain the benefit of Bay Point's funds without payment for the value thereof.

221.   Accordingly, Defendants have been unjustly enriched to Bay Point's detriment, and Bay Point is entitled to just compensation in an amount to be determined at trial.

222.   Finally, because an action based on a theory of unjust enrichment is available only in the absence of an express, written contract, Bay Point's claim for unjust enrichment is pled in the alternative to Counts Three, Four, Five, and Six, above.

## COUNT NINE
### Appointment of Receiver
### (All Defendants)

223.   The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

224.   This Court has the authority to appoint a receiver to assume custody, control, and management of property that is involved in litigation pursuant to Fed. R. Civ. P. 66.

225.   Section 4.1 of the Loan Agreement provides Bay Point with a security interest in Defendants' right, title, and interest in Defendants' Collateral, which consists of several specifically enumerated pieces of tangible and intangible goods and property, including certain of Defendants' bank accounts, equipment, investments, and money, among other property.

226.   Pursuant to the Loan Agreement, Bay Point's security interest in Defendants' Collateral serves as a valid security interest against the outstanding balance of the loan.

227.   Defendants have defaulted on their Loan obligations to Bay Point, and Bay Point currently faces a significant risk of nonpayment on the Loan Documents.

228.   Without the appointment of a receiver to protect Bay Point's security interest in Defendants' Collateral, there is a significant risk that the property will be concealed, lost, wasted, or diminished in value, leaving Bay Point inadequately secured against its impending loss.

229.   Accordingly, this Court should appoint a receiver to protect fully the Collateral identified in Section 4.1 of the Loan Agreement until further order of this Court so as to avoid any further concealment, loss, waste, or diminishment in value of the property.

<div align="center">

**COUNT TEN**
**Attorneys' Fees**
**(All Defendants)**

</div>

230.   The allegations of Paragraphs 1 through 163 above are incorporated by reference as if fully set forth herein.

231.   Pursuant to the Loan Agreement, Note, Guaranty Agreement, and First and Second Forbearance Agreements, Defendants are required to pay Bay Point's

attorneys' fees, costs, and expenses associated with this action.  (*See* Ex. E, § 11.4; Ex. F, at 2.; Ex. G, § 14; Ex. H, § 8; Ex. I, § 8.)

232.   Upon the Events of Default, the maturity of the Loan Documents and Forbearance Agreements was accelerated and the indebtedness, including Defendants' liability for Bay Point's aforementioned attorneys' fees and related costs, became immediately due and payable.

233.   Accordingly, Bay Point is entitled to its reasonable attorneys' fees and costs incurred in enforcing Defendants' obligations under the Loan Documents and Forbearance Agreements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Bay Point Capital Partners II, LP respectfully requests that the Court:

(a)   Enter judgment in favor of Bay Point and against Defendants on all counts;

(b)   Award Bay Point damages in an amount not less than $2,863,611.11, including:

(i)   $2,000,000.00 in unpaid principal under the Loan Documents;

(ii)   $526,666.67 in standard interest;

(iii)   $106,944.44 in default interest; and

- 65 -

(iv)    $230,000.00 in Late Fees.

(c)    Award Bay Point its attorneys' fees and litigation expenses pursuant to the terms of the Loan Agreement, Note, Guaranty Agreement, and First and Second Forbearance Agreements;

(d)    Award Bay Point treble damages, as well as its attorneys' fees and litigation expenses, for Defendants' violations of 18 U.S.C. §§ 1962(c) and (d);

(e)    Award Bay Point punitive damages under Nev. Rev. Stat. 42.005 for the sake of example and by way of punishing Defendants;

(f)    Appoint a receiver to protect fully the Collateral identified in Section 4.1 of the Loan Agreement until further order of this Court so as to avoid any further concealment, loss, waste, or diminishment in value of the property; and

(g)    Grant such other and further relief as may be just or equitable under the circumstances.

[Signatures on following page]

Respectfully submitted, this 8th day of March, 2021.

<div style="margin-left: 40%;">

**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**

By: /s/ *Alexandra S. Peurach*
Harris B. Winsberg (Bar No. 770892)
harris.winsberg@troutman.com
Alexandra S. Peurach (Bar No. 451333)
alexandra.peurach@troutman.com
Christopher J. Kelleher (Bar No. 937613)
chris.kelleher@troutman.com

Bank of America Plaza
600 Peachtree Street NE
Suite 3000
Atlanta, GA  30308-2216
Telephone:      404.885.3000
Facsimile:      404.885.3900

Attorneys for Plaintiff
Bay Point Capital Partners II, LP

</div>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BAY POINT CAPITAL PARTNERS II, LP,<br><br>   Plaintiff,<br><br>v.<br><br>HOPLITE, INC., HOPLITE ENTERTAINMENT, INC., and JONATHAN LEE SMITH,<br><br>   Defendants. | CIVIL ACTION NO.<br>1:21-cv-00375-MLB |

## **VERIFICATION**

Personally appeared before the undersigned officer duly authorized to administer oaths, Chandler Rierson, Senior Associate of Plaintiff Bay Point Capital Partners II, LP, who after being duly sworn, states that the facts alleged in Plaintiff's Verified Amended Complaint are true and correct based upon his personal knowledge and belief.

         Chandler Rierson
         Senior Associate

[Verification continues on following page]

Sworn to and subscribed
before me this ___5th___ day
of March, 2021.

Mary A. Stornetta

Notary Public
My commission expires: Feb 3, 2025

MARY A STORNETTA
Notary Public - State of Georgia
Cobb County
My Commission Expires Feb 3, 2025

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which serves notification of such filing to all CM/ECF participants.

This 8th day of March, 2021.

*/s/ Alexandra S. Peurach*
Alexandra S. Peurach (Bar No. 451333)